# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

MARIA ZUNIGA, EMILY HERNANDEZ,
JENNIFER GALLEGOS, CASSANDRA
GUTIERREZ, PRISCILLA GUTIERREZ,
STEPHANIE MANZANARES, PAT
VIGIL, MINDY HOERTER, and DEANNA
MIGLIO, on behalf of themselves and all
others similarly situated,

      Plaintiffs,

vs.                                                                      No. CIV 11-0877 JB/LAM

BERNALILLO COUNTY, JULIAN
BARELA, and DAN MAYFIELD,

      Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on the Plaintiffs' Motion and Supporting

Memorandum of Law in Support of Motion of Class Certification, filed June 13, 2014 (Doc.

136)("Motion").   The Court held a class certification hearing on February 4, 2015.[1]   See

Transcript of Motion for Class Certification Hearing held on February 4, 2015 ("Tr.").

The primary issues are: (i) whether variations in department, managerial practices, and

role among the proposed plaintiff class defeats commonality and predominance under rule 23;

and (ii) whether rule 23(a)'s requirements -- numerosity, commonality, typicality, and adequacy

-- and rule 23(b)(3)'s requirements -- predominance and superiority -- are otherwise met with

regard to the proposed class.   First, the central issue in this case -- how the Defendant should

have compensated and selected the Plaintiffs -- varies among departments and position.   When

---

[1]The Court issued an interlocutory order on March 31, 2015, granting class certification
(Doc. 163) and vacated the class certification order on April 1, 2015 (Doc. 164).

considered alongside the individual compensation issues, these variations among departments, titles, roles, and job functions, defeats commonality and predominance.  This proposed class action therefore satisfies the rule 23(a) prerequisite of numerosity and the rule 23(b) superiority requirement, but it fails rule 23(a)'s commonality, typicality, and adequacy requirements as well as rule 23(b)'s predominance requirement.  The Court thus denies the Motion.

## FINDINGS OF FACT

Both the Plaintiffs and the Defendants have submitted briefings on the Plaintiffs' Motion.  See Plaintiffs' Motion and Supporting Memorandum of Law in Support of Motion for Class Certification, filed on June 13, 2014 (Doc. 136)("Motion"); Defendants' Response in Opposition to Plaintiffs' Motion for Class Certification, filed on August 29, 2014 (Doc. 142)("Response"); and Plaintiffs' Reply to Defendant's Opposition to Their Motion for Class Certification, filed on November 3, 2014 (Doc. 151)("Reply").  The Court has carefully considered all factual assertions, and accepts some of them, rejects others, and finds some facts that no party brought to its attention.[2]  The Court also liberally judicially notices background facts.  See Fed. R. Evid. 201.  All of these findings of fact are authoritative only on the question of class certification, and the parties may relitigate any of them at the merits stage.  See Abbott v. Lockheed Martin Corp., 725 F.3d 803, 810 (7th Cir. 2013); In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 313 (3rd Cir. 2008); Gariety v. Grant Thornton, LLP, 368 F.3d 356, 366 (4th Cir. 2004).  The Court applied the Federal Rules of Evidence at the class certification hearing, ruled on several

---

[2]The Court is not required to make formal findings of fact in ruling on a class certification motion.  See Fed. R. Civ. P. 54(a)(3) ("The court is not required to state findings or conclusions when ruling on a motion under Rule 12 or 56 or, unless these rules provide otherwise, on any other motion."); id. advisory committee's notes to 2007 amendments ("Amended Rule 52(a)(3) says that findings are unnecessary 'unless these rules provide otherwise.'  This change reflects provisions in other rules that require Rule 52 findings on deciding motions. Rules 23(e), 23(h), and 54(d)(2)(C) [but not rule 23(a), (b), or (g)] are examples.").  The Court has elected to do so for the parties' benefit.

evidentiary objections, and considered only admissible evidence in finding these facts.

1.      **The Plaintiffs**.

1.      The Plaintiffs include Maria Zuniga, Emily Hernandez, Jennifer Gallegos, Cassandra Gutierrez, Priscilla Gutierrez, Stephanie Manzanares, Pat Vigil, Mindy Hoerter, and Deanna Miglio (collectively, "the Plaintiffs").

2.      The Plaintiffs seek to represent a County-wide class consisting of "[a]ll female employees grace C through H who are, were, or will be employed by the County of Bernalillo at any time between June 18, 2008 and the present." See Complaint ¶ 42, at 9.

3.      As of February 6, 2015, seven of the nine named Plaintiffs were employees in the Finance Division's Budget Department of Bernalillo County.  Four were no longer Bernalillo County employees at the time of the Class Certification hearing.

4.      Plaintiff Maria Zuniga is a manager and supervisor within her department, and has served as the Budget and Business Improvement Administrator for Bernalillo County since September, 2012. See Response at 7.

5.      Plaintiff Jennifer Gallegos is a supervisor and manager in the Budget Department and serves as Financial Project Coordinator.  See Response at 7.  Cassandra Gutierrez was employed in the Budget Department as a Financial Services Administrator I ("FSA") until she was promoted to FSA II.  See Response at 7.

6.      The Plaintiffs who worked in Bernalillo County's Budget Department who are no longer employees include: (i) Emily Hernandez, who was employed as a FSA I and II from August, 2006, to June, 2012; (ii) Stephanie Manzanares, who was employed as a FSA II and then a FSA III from March, 2008, until September, 2011; (iii) Pat Vigil, who was employed as a FSA II and then FSA III from September, 2008, until March, 2011; and (iv) Priscilla Gutierrez, who

was employed as a FSA IV from January, 1997, until she retired in March, 2013.  See Response at 7.

7.    The two remaining named Plaintiffs worked in other departments during the class period: (i) Deanna Miglio, who has been the Right of Way Manager in the Public Works Department since June, 2009, where she has discretionary authority to request and make employment decisions similar to those challenged by the Plaintiffs' lawsuit about employees in the Public Works Department, and has exercised that discretion; and (ii) Mindy Hoerter, who was a Systems Administrator in the Information Technology ("IT") department from December, 2009, until December, 2011, when she left her employment with the Bernalillo County.  See Response at 7-8.

8.    Employees who are member of a collective bargaining unit are not part of this case.  See Motion at 8-9.

   **2**.    **The Defendants**.

9.    Bernalillo County is the government agency responsible for administering and coordinating government services in Bernalillo County.   See "The Manager's Role" http://www.bernco.gov/county-manager/the-managers-role.aspx, (last accessed September 27, 2016).

10.    Bernalillo County is a public entity and an employer as defined by Title VII and the NMHRA.  See Complaint ¶5, at 2.

11.    Julian Barela serves in a supervisory capacity over the Plaintiffs by Bernalillo County.  See Complaint ¶ 7, at 2.

12.    Dan Mayfield was employed as a Deputy County Manager for Budget and Finance by Bernalillo County.  See Complaint ¶ 8, at 3.

13.     Bernalillo County is divided into four divisions: Community Services, Finance, Public Works, and Public Safety; a Deputy County Manager and a director leads each one.  See Torres Dec ¶ 3, at 1-2.  The Human Resources Department ("HR"), Information Technology Department, and Public Information Office each report directly to the County Manager; the Legal Department reports to the Board of Commissioners; and all other Department Directors report to the Division Deputy County Manager.  See Torres Dec ¶ 3, at 1-2.

14.     The Bernalillo County Manager is appointed by and reports to the Board of County commissioners, and sits at the top of the County's organizational structure.  See Report of Richard F. Martell at 42, filed on June 13, 2014 (Doc. 136-4)("Martell Report").

15.     Deputy County Managers are assigned to each division and report directly to the County Manager.  See Martel Report at 7.    Deputy County Managers supervise Department Directors who report to the Deputy County Managers and the County HR Director, who also reports directly to the County Manager.  See Martel Report at 7.

16.     In addition to the County HR Director, Bernalillo County has a Compensation Manager and the Employment Manager, both of whom report directly the HR Director.  See Martel Report at 7.

17.     Within each department, there are supervisors, managers, and administrators who perform management-type functions.  See Martel Report at 7.

18.     Bernalillo County employs approximately 2,560 people, in many hundreds of different positions, for variable lengths of time.  See Renetta Torres Depo. 38:18-24 (taken April 1, 2013)(Doc. 142-23)("RT Depo.").  Approximately 156 people have the discretionary authority to request hires, give promotions, grant reclassifications, make transfers, approve pay increases, and make selections for hire and promotion; of these, the vast majority are departmental

supervisors and managers below the level of Department Director.  <u>See</u> Torres Dec. ¶ 5, at 2. The numbers were roughly the same during the class period as the current period.  <u>See</u> Torres Dec. ¶ 5, at 2.

19.     Bernalillo County's employment policy manual for non-union employees is found in the Employment Relations Rules and Regulations for Bernalillo County ("Rules & Regs"). The Rules & Regs' stated purpose "is to establish consistent basic policies and practices governing relations between the County of Bernalillo and its employees."  <u>See</u> Rules & Regs at 2.

20.     The employment practices and policies apply to all class members and their male comparators.  <u>See</u> Employment Relations Rules & Regs.

21.     The County Manager is responsible for administration of the Employment Relations System, Article Ill, Division 3, Section 2-91 of the Bernalillo County Code, the Rules and Regulations, and all approved policies, directives and procedures.  <u>See</u> Rules & Regs §101 (A).

22.     The County Manager is responsible for recommending changes to the employment relations rules and regulations, administrative instructions, procedures and directives for administering the employment relations system.  <u>See</u> Rules & Regs, §101 (B).

23.     The County Manager is responsible for establishing a continuing program for the Recruitment, Compensation, Promotion, Training and Discipline of County employees, and related aspects of employment relations in compliance with the provision of the Bernalillo County Code, state and federal laws, the Rules and Regulations, and all policies adopted by the Bernalillo County Commission.  <u>See</u> Rules & Regs § 101 (B).

24.     With regard to employee compensation, the County Manager maintains the classification and comprehensive pay plan for classified employees of the County as established by the Board of County Commissioners.  See Rules & Regs § 101 (C).  The County Manager implements a system of compensation and benefits for unclassified employees in a manner that permits the County to effectively recruit and retain unclassified employees.  See Rules & Regs § 101 (C).

25.     With regard to position classifications, the Bernalillo County Human Resources department determines position classifications, subject to review and approval of the County Manager or designee.  See Rules & Regs § 101 (D).

26.     With regard to job evaluation studies, the County Manager may authorize the Human Resources Department to conduct job evaluation studies when deemed necessary.  See Rules & Regs § 201.  Recommendations that ensue are submitted to the County Manager for review and approval.  See Rules & Regs § 201.

27.     With regard to Job Reclassifications, employees who considers their position improperly graded may submit a written request for a job evaluation to their supervisor.  See Rules & Regs § 203.  The written request shall contain justification for the proposed reclassification. If the supervisor agrees with the need for reclassification, the supervisor shall submit the request along with a written recommendation to the Elected Official, Deputy County Manager, County Attorney, or Department Director.  Approval of the request resides with one of the aforementioned senior Bernalillo County officials.  See Rules & Regs § 203.

28.     Bernalillo County's Human Resources Department is responsible for Recruiting individuals for unfilled Bernalillo County positions.  See Rules & Regs § 301 (A).

29.     Two people have served as County Manager since the class commencement

period: Thaddeus Lucero until January, 2011, followed by Tom Zdunek.  See Torres Dec ¶ 2, at 1.

30.     During the class period, approximately three women have served as Deputy County Managers, twelve women have served as Department Directors, and additional women have served as department supervisors and managers, including named Plaintiffs Zuniga, Gallegos, and Miglio.  See Torres Dec. ¶ 4, at 2.

31.     Bernalillo County has a centralized reporting and decision-making structure.  See Torres Depo. 38:18-23.  References to "County-wide" policies and practices refer to the policies and practices that apply to non-bargaining -- nonunion -- employers.

32.     There is little-to-no monitoring to affirm the presence or absence of gender equity.  See Martell Report at 20.  Efforts by Bernalillo County to monitor hiring, promotion or salary decisions for potential gender inequities are mostly non-existent.  See Martell Report at 20.

33.     County-wide policies and practices are deficient with respect to identifying and monitoring gender bias in the workplace, and the policies and practices that govern personnel decision-making throughout the County are vulnerable to gender bias in a manner that is likely to disadvantage women.  See Martel Report at 6-7.

**3.     County-Wide Policies for Selection of Employees.**

34.     Bernalillo County uses the same selection process for all regular vacant positions. See Depo. of Virginia Chavez 57:18-58:1, 85:22-86:6 (taken on April 3, 2013 )(Doc. 142-24)("Chavez Depo.").  The job posting must be submitted to the HR Department, which is then posted online.  See Chavez Depo. 57:18-58:1, 85:22-86:6.  The HR Department screens all applicants, determines whether an applicant meets the minimum qualifications, and prepares a

list of qualified applicants.  See Chavez Depo. 57:18-58:1, 85:22-86:6.

35.    Next, the hiring manager selects a minimum of three applicants to interview from the qualified candidate pool.   See Chavez Depo., 92:6-20.   Once a candidate is deemed minimally qualified, he/she is on equal footing with the other candidates.   See Transcript of Deposition of Tom Zdunek 51:11-18, 52:1-12 (taken on June 14, 2013)(Doc. 142-26)("Zdunek Depo.").

36.    Bernalillo County disavows a policy of hiring the most qualified person for the job.  Instead of objective qualifications, the top criterion used in making selective decisions is the "personal preference of the interviewer," a factor that readily lends itself to bias.  See Martell Report at 42; Torres Depo., 224:7-23.  Section 304 of the County's Rules & Regs provides that "[t]he basis for a final offer of employment shall include but not be limited to the applicant's qualifications, skills, education, previous applicable experience, personal interview(s), and reference check."

37.    There is no oversight in place in Bernalillo County to ensure the most qualified job applicants are selected to interview.  See Zdunek Depo. 290.  There is no oversight to ensure that selection decisions made by the hiring manager are correct.  See Chavez Depo. 57:18-58:1.

38.    There is no formal comparison of the qualifications of job applicants selected for interview vs. those applicants who were not selected.  See Zdunek Depo. 51:11-18, 52:1-12.

39.    All the candidates interviewed by Bernalillo County have been screened and determined to be qualified for the position.  See Torres Dec. ¶ 16, at 8-9.  The hiring manager has the discretion to select the candidate that best suits the needs of the department at the time. See Torres Dec. ¶ 16, at 8-9.

40.    The Bernalillo County-wide policy is that, as long as the candidate meets the

minimum qualifications, any choice by a manager for the position is acceptable.  See Martell Report at 42.

41.    Once a selection is made, a "Confirmation Sheet" listing the candidates interviewed and the candidate selected is submitted to the HR Director for review and approval. See "Administrative Instruction No. HR 02" (filed on Jun 13, 2014)(Doc. 136-42).

42.    In practice, approval by the HR Director is typically a matter of oversight and ratification, as HR does not participate in the interview process or selection decision, and ordinarily defers to the discretion of the hiring manager after the candidates have been screened and qualified.  See Torres Dec. ¶ 17, at 9.

43.    Given Bernalillo County's rules and procedures, the involvement of interview panel members, and oversight by the Department Director, the County Manager, the HR Director, and sometimes the Deputy County Manager and other department personnel, a selection decision based on gender bias would have to involve the participation of many people. See Torres Dec. ¶ 17, at 9.

44.    Bernalillo County's hierarchy for positions in Grades C through H demonstrates that women are more represented in lower grades and less represented in higher grades ((i) Grade C: 71.3% female; (ii) Grade D: 44.4% female; (iii) Grade E 34.4% female; (iv) Grade F: 35.9% female; (v) Grade G: 43.0% female; and (vi) Grade H: 25.6% female).  See Motion at 136.  For higher level positions, including career ladder positions that entail advancement to higher grades, the County does not give preference to internal applicants.  See Motion at 34.

45.    Bernalillo County's data regarding applicants and selections does not lend itself to statistical analysis.  See Chavez Depo. 204:1-8.  Bernalillo County does not perform analysis of the selection rate for female and male job applicants to determine whether there is any disparate

impact in its hiring decision.  See Chavez Depo. 105:15-106:6.

46.     Plaintiffs' anecdotal evidence of hiring practices presents instances that favor male job applicants over female applicants.  See Motion at 35.  A male did not meet the minimum qualifications for a posted position so a job was reposted and the male then had the experience to qualify for the position.  See Motion at 35.  A self-proclaimed "sexist" manager, promoted 14 males and only hired females into entry level promotions.  See Motion at 35.  The promotion that an EEOC claimant applied for was given to a lesser-qualified male.  See Motion at 35.

### 4.     County-Wide Policies for Employee Compensation.

47.     The Board of County Commissioners adopted a Compensation Plan for classified employees.  Such plan shall establish a schedule containing a maximum and minimum pay range for each position.  See Rules & Regs § 501 (A).

48.     The County Manager reviews the compensation plan annually and may initiate comparative wage studies and market surveys of salary levels.  See Rules & Regs § 501 (B). The County Manager may then recommend changes to the compensation plan to the Board of County Commissioners for consideration.  See Rules & Regs § 501 (B).

49.     Bernalillo County job classifications are specified in the "Bernalillo County Job Classification" document.  See Torres Dec. ¶ 25, at 11.  Jobs are classified through a gender-neutral process; classified positions are analyzed using a quantitative method of job evaluation known as "factor comparison," in which "a series of rankings are conducted to assess which jobs contain more of a specific compensable factor than other jobs being evaluated."  Torres Dec. ¶ 25, at 11.

50.     The job classifications method applies to classification of new positions and to

reclassifications of existing positions.  See Torres Dec. ¶ 25, at 11.

51.     Each Grade has twenty-eight pay steps.  See FLSA Exempt Pay Scales (Hourly Rates).

52.     The written guidance to management is that new hires should start at Step 1 or 2. See Rules & Regs § 503(A).  Bernalillo County department managers may request an exception if a written justification supports the exception.  See Rules &  Regs § 503(A).

53.     Bernalillo County defines a promotion as "the transfer of an employee through the hiring process to a position of greater responsibility, higher classification, and higher salary." Job Classification Policy.  Some positions in Grades C through H at the County have career ladders.  See Transcript of Terese Sarracino Deposition, 75:16-22, taken on June 10, 2013 (Doc 142-25)("Sarracino Depo.).

54.     A career ladder is a defined progression from an entry-level grade to high grade(s) within a given position, such as a FSA.  See Sarracino Depo. 18:12-16.  Department Directors must request the advancement of an employee from one grade to the next, as well as provide justification for advancement.  See Email between J. Gallegos and J. Barela regarding FSA Career Ladder (dated June 2009).

55.     Although the County Manager's approval is required for pay-increase exceptions, a department manager typically initiates in a "bottom up" request, which is then ratified by the County Manager.  See Torres Dec. ¶ 30, at 13.

56.     Compensation for employees selected to a higher grade normally starts at the entry level of the new grade or a five percent increase, and adjustment to the nearest higher step in the new grade, whichever is greater.  See Rules & Regs, § 503(A); Zdunek Depo., 180:5-24. If a manager wants more than the standard five percent pay increase, he or she is required to

request the increase through a compensation analysis, which is ultimately subject to the approval of the County Manager.  See Rules & Regs; § 503(A); Zdunek Depo. 135:22-136:9, 182:4-9, 200:19-24.  Whether to request a pay change for a given employee is within the Department Director or manager's discretion.  See Sarracino Depo. 76:16-22.

57.     A supervisor, manager, or department director may request a change in compensation for a new hire or current employee within his or her department for the following reasons: (i) in connection with a hire, to offer pay above Step 2 of grade the posted position; (ii) completion of a career ladder goal; (iii) promotion or change in position; (iv) additional duties to existing position (reclassification); (v) temporary supervisory duties; (vi) transfer; or (vii) demotion. See Motion at 17.

58.     When a pay increase or deviation from entry level pay is proposed by a manager and the department director concurs, the department director will then submit a request for a compensation analysis to the Human Resources Director.  See Motion at 14.

59.     Pay-increase requests are sent to Human Resources, which provides assistance by preparing a "compensation review" and making a recommendation concerning the request.  The Human Resources Director sends the request to the Compensation Section Manager and a HR generalist is assigned to analyze it.  See Response 10-11.

60.     This analysis usually includes calculation of the fiscal impact on the department's budget, and a comparison of the candidate/employee to Bernalillo County employees with approximately similar job duties and approximately similar relevant experience and education. See Response at 11.

61.     Other factors considered for pay increase include licensure/certification, departmental needs, special skills or experience of the candidate/employee needed by the

department at any given time, factors bearing on the ability to recruit and retain employees with such skills and experience, and longevity/seniority with the County.  See Response at 11.  The candidate/employee's race, national origin, age, and gender are not provided to the generalist and are not considered in the analysis.  See Response at 11.  No factors are required to be considered; nor are the factors considered required to be weighted in any way.  See Torres Dec. ¶ 27, at 12.

62.    Bernalillo County's written and spoken policies avow that the duties, responsibilities and qualifications, including education, experience, longevity, licensure, and skills, determine the level of compensation.  See Rules & Regs Section 501(C)(2); Sarracino Depo. 110:5-20.

63.    Hiring managers have complete discretion over whom to pick to interview and to hire based on factors that they deem appropriate, including their own preferences; "[t]his is precisely the type of selection practice that is vulnerable to gender bias insofar as the hiring manager is not charged with interviewing and hiring this most qualified applicant -- thus, any objective differences among qualified job candidates matter not at all."  See Martello Report at 31, 38, 42.

64.    Statistically significant gender disparities in pay exist during each year in the relevant time period.  See  Motion at 28.  At any given time, there were approximately 332 employees in grades C through H, and of those 332 employees, 142 were in single-person jobs, and 47 of them worked in jobs with eight or fewer employees.  See Motion at 28.  Each grade contains positions in multiple departments and multiple occupations, "but all the positions within a Grade have been determined by the County to be of relatively equal value to the County."  Motion at 29.  Because the County's standard policy is that every position should start at entry level (Step 1 or 2), the pay for all the positions in a Grade should on average be approximately

the same for men and women.  See Motion at 29.

65.    The Plaintiffs' expert, Dr. Lanier, conducted a statistical analysis that compared all employees in a given Grade against all other employees in that Grade with a control variable for experience.  See Motion at 29.  This type of analysis is a multiple regression analysis, in which multiple factors, including gender, grade and experience, are used to explain differences in pay.  See Motion at 29.  The result of Dr. Lanier's multiple regression analysis is a comparison of the average pay of males and females within the same Grade and with similar years of experience.  See Motion at 29.

66.    On average, women employed at Bernalillo County made $2,895 less per year than men, taking into account Grade and experience.  See Motion at 29-30.  This pay difference represents 4.6 standard deviations.  See Motion at 29-30.

67.    Dr. Lanier conducted a second analysis which added the level of education to the comparison.  See Motion at 30.  On average, during the 2007-2012 time period, Bernalillo County paid women in the same pay class salaries that were $2,845 less than those paid to comparable men when controls for the years of experience and level of education were used in addition to Grade.  See Motion at 30.   This difference in pay between women and men represents 4.4 standard deviations.  See Motion at 30.

68.    Dr. Lanier also added a control for differences in department and for an IT-job identifier, see Motion at 30, and with these controls, the pay disparity decreases, but it is still statistically significant, see Motion at 30.

69.    Five out of six (83.3%) pay grades show pay gaps adverse to women; 75.9 percent of all departments show adverse impacts on females; and one-hundred percent of the six years show adverse impacts on females.  See Report of Louis R. Lanier at 11 (completed February 10,

2014),  filed on June 6, 2014, (Doc. 136-11)("Lanier Report").

70.     The conditions underlying the statistical pay results are not localized in nature, but widespread across pay grades, time, and across departments within Bernalillo County.  See Lanier Report at 11.

71.     There is anecdotal evidence of pay disparity between men and women employees at Bernalillo County.  See Motion at 32.  David Martell, a male, received a raise because of compression, but, Zuniga, a female, supervised people who made more than she did.  See Motion at 32.

## PROCEDURAL BACKGROUND

The Court will outline the basic factual allegations and legal arguments underlying the Plaintiffs' case.  The Court will then discuss the Defendants' responses to those arguments.  The Court will later make conclusions of law to rule on the Motion.

1.     **The Pleadings**.

In ruling on a class certification motion, the Court does not accept the facts alleged in the pleadings as true, but must find all facts bearing on the question of certification, even if those facts also bear on the merits of the substantive claims.  The Court is cognizant that it must not decide the merits at this stage of the case and expressly does not decide the case's merits.  The above findings of fact are tentative and made solely to allow the Court to decide whether class certification is appropriate.

a.     **The Complaint**.

1.     This case is a proposed class action asserting discrimination on the basis of gender in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, as amended by the Lilly Ledbetter Fair Pay Act, § 3(e), 42 U.S.C.A § 2000e-5(e), and the New Mexico

Human Rights Act, NMSA § 28-1-1-1.  <u>See</u> Maria Zuniga, Emily Hernandez, Jennifer Gallegos,

Cassandra Gutierrez, Priscilla Gutierrez, Stephanie Manzanares, Pat Vigil, Mindy Hoerter, on

behalf of themselves and all others similarly situated, v. County of Bernalillo, Julian Barela, and

Dan Mayfield, filed September 29, 2011, ¶ 44-84, at 10-17 (Doc. 1)("Complaint").   The

Plaintiffs assert Bernalillo County has a pattern and practice of discriminating against its female

employees -- disparate treatment -- in compensation, as well as in selection for hire and

promotion.  <u>See</u> Complaint ¶¶ 44-84, at 10-17.

2.     On May 1, 2012, the Plaintiffs filed their First Amended Complaint.  <u>See</u> First

Amended Complaint at 1, filed May 1, 2012 (Doc. 21)("FAC").

3.     The Plaintiffs further assert Bernalillo County's formally noticed policies of

setting compensation and selecting employees have a disparate impact on females.  <u>See</u> FAC ¶¶

15-16, at 5.  The Plaintiffs seek class action certification for female employees and applicants for

injunctive relief under rules 23(a)-(b)(2), and for damages under rule 23(b)(2).  <u>See</u> Motion at 1.

4.     Zuniga, Hernandez, Gallegos, C. Gutierrez, P. Gutierrez, Manzanares, Vigil, and

Hoerter seek to represent all similarly situated females whom Bernalillo County employs or

employed in professional-level positions grades C through H.  The Plaintiffs' proposed class

period is June 18, 2008 -- two years before the named Plaintiffs filed EEOC charges -- to the

present.  <u>See</u> FAC ¶¶ 44-51, at 10-12.

5.     The Plaintiffs contend that there are significant pay disparities resulting from

Bernalillo County's employment policies and procedures.  <u>See</u> FAC ¶15, at 5.

**b.     <u>The Answer.</u>**

6.     Bernalillo County answered the Complaint on December 21, 2011.  <u>See</u> Answer

to Complaint, filed on December 21, 2011 (Doc. 5)("Answer").  Bernalillo County answered the

First Amended Complaint on May 22, 2012.  See Answer to First Amended Complaint, filed on

May 22, 2012 (Doc. 23)("Answer to FAC").   Bernalillo County denies almost all of the

Plaintiffs' allegations, except the jurisdictional and background facts about the parties.   See

Answer to FAC ¶¶ 1-87, at 1-12.

       7.      Bernalillo County asserts fifteen defenses for: (i) failure to state a claim upon

which relief may be granted; (ii) failure to mitigate the damages Plaintiffs seek; (iii) any injuries

or damages that  the Plaintiffs allege in the complaint were the proximate result of the Plaintiffs'

own actions or the acts of third parties for which the Defendants are not liable; (iv) the

Defendants acted in good faith and in a reasonable manner, given the information and

circumstances existing at the time; (v) all employment decisions regarding the Plaintiffs were

made for legitimate reasons which were legal and constitutional, and did not violate the

Plaintiffs' constitutional or statutory rights; (vi) decisions regarding the Plaintiffs' employment

were made for legitimate reasons which were legal, constitutional, and non-discriminatory, and

did not violate the Plaintiffs' constitutional or statutory rights; (vii) the Defendants took no

improperly motivated action regarding the Plaintiffs and did not act with the intention to harm

the Plaintiffs; (viii) the Plaintiffs' failure to exhaust applicable administrative or internal

remedies; (ix) the Plaintiffs' Complaint is frivolous, unreasonable, groundless, and harassing; (x)

the Defendants should recover all their costs and attorney's fees incurred; (xi) the alleged

retaliatory action was not a motivating factor in the employment decisions made regarding the

Plaintiffs; (xii) the positions that the Plaintiffs compare are not equal in nature, quality, quantity,

or character; (xiii) the positions that the Plaintiffs compare do not require equal work; are not

jobs requiring equal skill, effort, and responsibilities; and do not have similar working

conditions; (xiv) unequal pay for the Plaintiffs' positions are the result of a seniority system,

merit system,  or a system that measures earnings by quantity or quality of production; and (xv) the affirmative defenses under Rule 8 of the Federal Rules of Civil Procedure bars the claims in the Plaintiffs' complaint.  See Answer to FAC, ¶¶ 1-16, at 13-14.

**2.      The Motion.**

8.      In the Motion, the Plaintiffs assert that Bernalillo County has a pattern and practice of discriminating against its female employees in compensation, and in selecting employees for hire and promotion.  See Motion at 1.  The Plaintiffs further assert that Bernalillo County's facially neutral policies for setting compensation have a disparate impact on Bernalillo County's female employees.  See Motion at 1.

9.      The Plaintiffs assert that their evidence satisfies the rule 23 elements needed to certify three sub-classes comprising of 230 female employees whom Bernalillo County's gender discrimination harmed.  See Motion at 1.  The Plaintiffs assert that the three sub-classes are (i) pay class; (ii) selection class; and (iii) injunctive relief class.   See Motion at 2.

10.      The Plaintiffs request that the Court certify the following three sub-classes:

**a.**   A rule 23(b)(3) pay class consisting of all female employees employed in exempt (salaried) positions in the County's pay grades C-H employed at any point between June 2008 and the date of final judgment, a definition that is consistent with Title VII of the Civil Rights Act as amended by the Lilly Ledbetter Act of 2008.

**b.**   A rule 23(b)(3) selection class consisting of all females who applied for a position at the County in grades C-H at any point between June 2008 and the date of judgment.

**c.**   A rule (b)(2) injunctive relief class for class-wide declaratory and injunctive relief.

Motion at 5.

11.      The Plaintiffs assert that Bernalillo County comprises one geographic location, with highly centralized policies, procedures, and decision making that apply to all class

members.  See Motion at 2.

12.     The Plaintiffs assert that pay discrimination is enabled by Bernalillo County's pay steps, which permit dramatic variations within the position classifications (Grades), and a lack of adequate objective criteria to ensure that employee compensation decisions are made without gender bias or in a discriminatory manner.  See Motion at 2.

13.     The Plaintiffs assert that it is within a manager's discretion to determine whether an employee's compensation is based on their education, experience, or other factors.  See Motion at 3.  The Plaintiffs assert that Bernalillo County managers selectively use facially neutral criteria such as education or experience to justify differences in pay that disadvantage Bernalillo County's female employees.  See Motion at 3.

14.     The Plaintiffs assert that there is: (i) significant statistical evidence of gender pay inequities; (ii) anecdotal evidence supporting their allegations that females class members were paid significantly less than men in the same positions; (iii) evidence that female employees hold a disproportionate number of jobs in lower level pay grades at Bernalillo County; and (iv) evidence that Bernalillo County fails to prevent and address complaints of gender discrimination. See Motion at 3-4.

15.     The Plaintiffs assert that Bernalillo County fails to monitor employee compensation and selection decision-making processes or place any effective checks over managers, allowing them to act on conscious or subconscious bias.  See Motion at 3.

16.     The Plaintiffs assert that the facts in their Complaint present the "ideal" situation for class certification.  Motion at 4.  With respect to numerosity, the Plaintiffs assert that the 230-member and sixty-plus member sub-classes exceed the forty-member threshold for presumptive numerosity.  See Motion at 4.

17.     With respect to commonality and typicality, the Plaintiffs assert that their claims revolve around uniform practices and highly centralized decision-making that apply to the entire class, and therefore satisfy the rule 23 requirements. <u>See</u> Motion at 4.

18.     The Plaintiffs assert that the uniform procedures and centralized decision-making policies may demonstrate that they and the class members were discriminated against in the same basic manner, and that the Plaintiffs and their counsel are adequate to represent the class. <u>See</u> Motion at 4.

**3.     <u>The Response</u>.**

19.     In response to the Plaintiffs' Motion for class certification, the Defendants assert that the Plaintiffs do not satisfy the rule 23 requirements for class certification. <u>See</u> Response. The Defendants argue that the Plaintiffs' evidence does not establish that Bernalillo County operated under a general policy of gender discrimination, and that the evidence does not establish any causal link between any challenged decision concerning pay or selection, and the alleged discrimination. <u>See</u> Response at 8-9.

20.     The Defendants assert that the Plaintiffs' motion for class certification is wholly inadequate because the evidence is, according to the Defendants, insufficient to tie the Plaintiffs' individual allegations of gender discrimination to the existence of a class of female Bernalillo County employees and job applicants who have suffered the same alleged injury as the Plaintiffs. <u>See</u> Response at 9.

21.     The Defendants assert that there is no evidence that female employees and job applicants are treated differently than male employees or job applicants under any of Bernalillo County's selection and pay policies, practices or procedures. <u>See</u> Response at 10. The Plaintiffs also assert that there is no evidence that any policy, practice, or procedure has a disparate impact

on Bernalillo County's female employees.  <u>See</u> Response at 10.

22.    With respect to the rule 23 requirements for class certification, the Defendants first assert that the Plaintiffs offer no evidence to support their claim that rule 23's numerosity requirement is met.  <u>See</u> Response at 20.  The Defendants assert that the Plaintiffs contend that numerosity is presumed, because they allege there are more than forty women in the proposed class.  <u>See</u> Response at 20.  The Defendants assert that the Court must be able to ascertain that there are a sufficient number of individuals within the class definition to make their joinder impractical and that ascertainment of class membership cannot depend on individualized determinations.  <u>See</u> Response at 20-21.

23.    With respect to commonality, the Defendants assert that the Plaintiffs have not shown the existence of a question common to the class.  <u>See</u> Response at 23.  Relying on the Supreme Court's decision in <u>Wal-Mart v. Dukes</u>, 564 U.S. 338 (2011),  the Defendants assert that the Plaintiffs' claims of discrimination are not based on the uniform application of common policies and procedures that a small group of high-ranking officials created, but rather on the exercise of discretion and the use of subjective criteria by numerous supervisors and managers in making hundreds of requests and decisions concerning compensation, hiring, and promotion that are subject to oversight by higher-level management.  <u>See</u> Response at 30.

24.    The Defendants also assert that the Plaintiffs' Motion fails to address "the crux" of the class certification inquiry -- the numerous and varied reasons that form the bases upon which individual lower-level managers make compensation and selection decisions about individual employees, and that, without such evidence, there can be no "glue holding the alleged reasons for those decisions together," and no basis from which to conclude "the examination of all the class members' claims for relief will produce a common answer to the crucial question

why [an employee] was disfavored."  See Response at 33 (quoting Wal-Mart v. Dukes, 564 U.S. at 352).

25.     The Defendants also assert that the Plaintiffs' Motion fails to prove the existence of a common question amenable to class-wide resolution.  See Response at 33.  The Defendants assert that the record demonstrates that Bernalillo County has thousands of employees working in numerous different positions, for variable lengths of time, in an ever-evolving organizational structure that includes four divisions, twenty-three departments, and 156 supervisors and managers with the discretionary authority to request hires, promotions, and pay increases, and to make hiring decisions.  See Response at 33-34.

26.     The Defendants assert that the record also demonstrates that Bernalillo County has no uniform business practices that may have a direct adverse impact on all members of the proposed class.  See Response at 34.  The Defendants argue that, although Bernalillo County's rules and policies apply to the class, the Plaintiffs complain of subjective assessments, and of discretionary employment-related requests and decisions, made for any number of reasons, with consideration of any number of factors at any given time, none of which include gender.  See Response at 34.

27.     The Defendants assert that the record shows that the compensation and selection decisions challenged by the Plaintiffs turn on the substantial discretion of hundreds of individual managers.  See Response at 34.  The Defendants argue that the challenged employment decisions were not made in a top-down fashion, by a "highly centralized" group of high-level managers, nor do the lower-level managers exercise their discretionary authority in a "uniform" manner or according to a "common direction."  See Response at 34.

28.     The Defendants assert that numerous and different lower-level managers made, in the exercise of discretionary authority -- at different times -- under different circumstances, the challenged decisions, and for different reasons unrelated to gender, and therefore are not amenable to a class-wide resolution.  See Response at 34.

29.     The Defendants also challenge the findings of the Plaintiffs' industrial organization expert, Dr. Martell, and assert that his testimony is unreliable and irrelevant.  See Response at 37.  The Defendants assert that Dr. Martell does not offer evidence of any causal connection between any Bernalillo County policy, procedure, or decision that results in gender disparities in pay or selection.  See Response at 37.  The Defendants also argue that Dr. Martell's opinions are not scientifically reliable, and have no basis in scientific principles or method.  See Response at 38.  The Defendants also argue that the Plaintiffs' expert, Dr. Lanier, offers statistical evidence only as to annual pay, and that his analysis fails to offer significant proof of a common question amenable to a class-wide resolution.  See Response at 39.

30.     The Defendants assert that, to establish a prima facie case of disparate impact discrimination, plaintiffs must show that a specific identifiable employment practice or policy caused a significant disparate impact on a protected group, Apsley v. Boeing Co., 691 F.3d 1184, 1206-07 (10th Cir. 2012)(affirming district court's conclusion that employees could not show that they had suffered a significant disparate impact)(citing Pippin v. Burlington Res. Oil & Gas Co., 440 F.3d 1186, 1200 (10th Cir. 2006)), and that Dr. Lanier fails to show causation.  See Response at 40.

31.     The Defendants assert that the Plaintiffs' anecdotal evidence of gender discrimination is inadequate to establish class-wide disparate treatment.  See Response at 44. The Defendants argue that the Plaintiffs revert to anecdotal evidence of supposed hostility and

discrimination toward women through EEOC charges and civil complaints that contain mere allegations and conclusions.  See Response at 44.  The Defendants argue that this evidence is not amenable to class-wide proof and resolution.  See Response at 45.

32.     The Defendants argue that the Plaintiffs fail to satisfy rule 23(a)(3)'s requirement that the representative parties' claims or defenses are typical of the class claims or defenses and rule 23(a)(4)'s requirement that the representative parties will fairly and adequately protect the interests of the class.  See Response at 49.  The Defendants assert that the Plaintiffs cannot establish adequacy of representation because a conflict of interest exists between the named plaintiffs who are members of the supervisory class and the unnamed class members affected by the supervisory class' employment decisions.  See Response at 51.

33.     The Defendants assert that the Plaintiffs have not met their burden to prove that the rule 23(b)(3) or 23(b)(2)'s requirements are satisfied.  See Response at 52.  The Defendants argue that the Plaintiffs have not shown predominance and that the Defendants' alleged liability requires an inherently individualized inquiry which cannot be resolved on a class-wide basis. See Response at 53-54.  The Defendants also argue that the Plaintiffs have not shown superiority of the class remedy for purposes of a damage class.  See Response at 55.

**4.     The Reply.**

34.     The Plaintiffs replied to the Defendants Response on November 3, 2014.  See Reply at 1.  The Plaintiffs assert that they have satisfied the rule 23 requirements for class certification.  See Reply at 10.  The Plaintiffs argue that they have established commonality by tying the discretion exercised by Bernalillo County managers to specific policies and practices which discriminate against the class in a uniform matter.  See Reply at 10.

35.     In response to the Defendants' argument that the Plaintiffs fail to meet rule 23's class certification requirements because of a lack of evidence demonstrating that Bernalillo County's policies and procedures caused gender discrimination, the Plaintiffs contend that Bernalillo County's county-wide policies regarding employee compensation and selection decisions establish commonality among the plaintiff class and make the case suitable for class certification.  See Reply at 3-5.

36.     The Plaintiffs assert that the Defendants misconstrue Bernalillo County's organization structure, and that Bernalillo County's entity-wide policies and practices described by the Plaintiff demonstrate that there is commonality among the class members, because the policies and practices apply to all employees, and those policies and practices create an environment where gender discrimination can occur.  See Reply at 3-5.

37.     The Plaintiffs respond to the Defendants' characterization of employment decisions occurring in a "bottom-up" approach, and assert that, because Bernalillo County managers must follow set procedures and policies, employment decisions are highly centralized. See Reply 6-9.  The Plaintiffs argue that most Bernalillo County department directors are merely making requests for additional compensation for their employees and are not suggesting recommended increases to compensation steps, which demonstrates that they are bound to follow policies created by Bernalillo County management.  See Reply at 8-9.

**5.      The Class Certification Hearing.**

38.     The parties began the hearing by giving brief opening statements.  See Tr. at 3:23-50:2 (Court, Warner, Frank).

39.     In their opening, the Plaintiffs argued that Bernalillo County's employee selection and compensation policies lack objective standards and oversight to prevent gender

discrimination, and therefore create an environment where Bernalillo County female employees and job applicants are subject to gender discrimination.  See Tr. at 16:13-18:17 (Warner).

40.     The Defendants mainly argued in their opening that there is insufficient evidence to establish a causal connection between a particular hiring or compensation practice and gender based discrimination.  See Tr. at 49:4-16 (Frank).

### a.     Numerosity.

41.     The Court first addressed rule 23's numerosity requirement.  See Tr 2:22-25 (Court).  The Defendants argued that with respect to each class member, it is almost impossible to determine who really should be in the class.  See Tr. at 51:2-3 (Frank).

42.     The Plaintiffs then argued that the classes they seek to have certified are easy to identify, and that they know exactly who Bernalillo County employed in Grades C through H during the class time period.  See Tr. at 51:11-22 (Warner).  The Plaintiffs also argued that they know many, but not all, of the people who have applied for positions at Bernalillo County in Grades C through H.  See Tr. at 51:23-25 (Warner).

### b.     Commonality.

43.     The Court then addressed rule 23's commonality requirement.  See Tr 57:8-12 (Court).  The Plaintiffs argued that allegations in this case are different from the plaintiffs' allegations in Wal-Mart v. Dukes, 564 U.S. at 352, because Bernalillo County has county-wide employment policies and practices that apply to all workers, while Wal-Mart did not have these common policies in place.  See Tr. at 57:21-25 (Warner).   The Plaintiffs argued that since Bernalillo County's employment policies cover the entire organization, the policy, not the individual decisions made by managers following the policy, causes the discrimination.  See Tr. at 59:1-13 (Warner).

44.     The Plaintiffs then asserted that according to their expert, Dr. Lanier, statistical evidence shows that Bernalillo County's female employees are disadvantaged in compensation compared to male employees, and that fact is statistically significant.  See Tr. at 60:1-7 (Warner). The Plaintiffs asserted that they are able to add context to that finding through anecdotal evidence by showing that some of the upper-level managers have openly discussed that Bernalillo County's female employees are paid less than male employees.  See Tr. at 60:8-11 (Warner).

45.     The Plaintiffs then addressed the Defendants' criticism of the Plaintiffs' industrial organization expert, Dr. Martel's expert report by arguing that his findings show that a lack of oversight and objective criteria for employee selection and compensation decisions creates an environment where managers practice gender discrimination against female Bernalillo County employees.  See Tr. at 61:15-18 (Warner).

46.     The Plaintiffs then argued that Bernalillo County's policy of not requiring managers to hire the most qualified applicant for an open position disadvantages female job applicants.  See Tr. at 67:8-9 (Warner).

47.     The Plaintiffs argued that Bernalillo County's policies requiring managers to use human resources channels to hire employees and grant pay raises demonstrates that common policies affect the plaintiff class and that they have satisfied rule 23(a)'s commonality requirement.  See Tr. at 70:8-71:25 (Warner).

48.     The Court then addressed the appropriateness of the Plaintiffs' expert, Dr. Lanier. See Tr. 84:4-14 (Court)   The Plaintiffs argued that the class certification hearing is not appropriate to weigh expert opinion's value, see Tr. at 84:16-17 (Warner), and contended that they have retained the right expert who correctly performed the analysis warranted, see Tr. at

84:22-25 (Warner).

49.     The Plaintiffs conceded that by shrinking the sample size for their analysis, the Plaintiffs' expert, Dr. Lanier, reduced the result's statistical significance, but that his conclusions are still probative.  See Tr. at 85:1-5 (Warner).

50.     The Plaintiffs argued that their expert, Dr. Martell, does not aim to show the causation of gender discrimination at Bernalillo County, and that causation is not the only requirement to show that a class has been harmed.  See Tr. at 87:2-16 (Warner).  The Plaintiffs argued that, taken together, the Plaintiffs' expert opinions inform the Court that the policies cause a uniform harm to the class.  See Tr. at 87:16-20 (Warner).

51.     The Plaintiffs argued that there is evidence of broad-based harm to the class as a result of Bernalillo County's policies, such that the Plaintiffs are able to satisfy rule 23(b)'s commonality requirement.  See Tr. at 89:12-90:24 (Warner).

52.     The Defendants then responded to the Plaintiffs' assertions and argued that the Plaintiffs have not presented anything which identifies the common question that ties the representative plaintiffs to the proposed class to hold this case together.  See Tr. at 92:2-6 (Frank).

53.     The Defendants argued that the Plaintiffs' evidence demonstrates that women with less education and experience were at times paid more than their male counterparts, which underscores the Defendants' argument that there is no common question how Bernalillo County's policies, practices, and procedures disparately harmed women.  See Tr. at 92:19-93:5 (Frank).

c.     **Typicality**.

54.     The Court then addressed rule 23(a)'s requirement of typicality for the proposed

class.  See Tr. at 98:1-2 (Court).  The Plaintiffs argue that common policies and procedures exist across the board, and that the Plaintiffs' expert, Dr. Martel, found common and exhibited centralization.  See Tr. at 102:2-10 (Warner).

55.     The Plaintiffs argued that, under a rule 23 analysis, commonality, typicality, and adequacy "come together" under an approach to deal with the adequacy of class certification. Tr. at 103:7-11 (Warner).  The Plaintiffs argued that the claims that the class representatives make in their complaint will be typical of the class members' claims with the exact same evidence and exact same legal theories.  See Tr. at 104:7-11 (Warner).

56.     The Defendants then argued that, because of Bernalillo County's organizations structure, where managers are responsible for their own departments' employment decisions, that Plaintiffs' claims do not satisfy the requirements for adequacy or typicality.  See Tr. at 105:14-110:1 (Frank).

     **d.**     **Adequacy.**

57.     The Defendants then addressed additional facets of the adequacy requirement under rule 23(a).  The Defendants asserted that adequacy encompasses two inquiries: (i) whether there are any conflicts between the representatives and their counsel, and the class members; and (ii) whether the named plaintiffs and their counsel are competent and experienced, and will vigorously prosecute the matter.  See Tr. at 110:16-21 (Frank).

58.     The Defendants acknowledged that there is no issue that the Plaintiffs and their counsel are competent, experienced, and will vigorously prosecute the matter.  See Tr. at 110:23-111:7 (Frank).

59.     The Defendants argue, however, that three of the named Plaintiffs, Zuniga, Gallegos, and Miglio are supervisory class members whom the Plaintiffs allege have perpetuated

gender discrimination against the Plaintiffs, which creates a conflict between the class and the representative Plaintiffs, and renders the representative class inadequate to represent the class. See Tr. at 111:8-112:18.

## LAW REGARDING CERTIFYING CLASS ACTIONS UNDER RULE 23(b)(3)

1.      Rule 23 sets forth the requirements for certifying a class action under the federal rules.  See Fed. R. Civ. P. 23.  All classes must satisfy: (i) all of the requirements of rule 23(a); and (ii) one of the three requirements under rule 23(b), where the three sets of requirements correspond to the three categories of classes that a court may certify.  See Fed. R. Civ. P. 23(a)-(b). The plaintiff[3] bears the burden of showing that the requirements are met, see Rex v. Owens ex rel. Okla., 585 F.2d 432, 435 (10th Cir. 1978); Pueblo of Zuni v. United States, 243 F.R.D. 436, 444 (D.N.M. 2007)(Johnson, J.), but, in doubtful cases, class certification is favored, see Esplin v. Hirschi, 402 F.2d 94, 101 (10th Cir. 1968)("[T]he interests of justice require that in a doubtful case, . . . any error, if there is to be one, should be committed in favor of allowing the class action."); Eisen v. Carlisle & Jacquelin, 391 F.2d 555, 563 (2d Cir. 1968)("[W]e hold that . . . rule [23] should be given a liberal rather than a restrictive interpretation, and that [denying certification] is justified only by a clear showing to that effect . . . ").  In ruling on a class certification motion, the Court need not accept either party's representations, but must independently find the relevant facts to a preponderance of the evidence.[4]  See Rutstein v. Avis

---

[3]Technically, it is the party seeking certification, i.e., the movant, who bears the burden of proof, and defendants may also move for class certification. See William B. Rubenstein, Newberg on Class Action § 7:20 (5th ed.). As a practical matter, however, motions for class certification are made almost exclusively by plaintiffs.

[4]As the Court has previously noted, Tenth Circuit precedent suggests that the Court must show some level of deference to the Complaint's factual allegations when ruling on a rule 23 motion: "The Court must accept a plaintiff's substantive allegations as true, but it "need not blindly rely on conclusory allegations which parrot Rule 23," and "may consider the legal and

Rent–A–Car Sys., Inc., 211 F.3d 1228, 1234 (11th Cir. 2000)("Going beyond the pleadings is necessary, as a court must understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues.").  "In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met."  Anderson v. City of Albuquerque, 690 F.2d 796, 799 (10th Cir. 1982).  See Vallario v. Vandehey, 554 F.3d 1259, 1267 (10th Cir. 2009)("We, of course, adhere to the principle that class certification does not depend on the merits of a suit.").  Still, the Court must conduct a rigorous analysis of the rule 23 requirements, even if the facts that the Court finds in its analysis bear on the merits of the suit:

> Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule -- that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc. We recognized in [Gen. Tel. Co. of the Southwest v.] Falcon that "sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question," and that certification is proper only if "the trial court is satisfied, after a rigorous

---

 factual issues presented by plaintiff's complaints."  In re Thornburg Mortg., Inc. Sec. Litig., 912 F. Supp. 2d 1178, 1220 (D.N.M. 2012)(Browning, J.)(citing Shook v. El Paso Cnty., 386 F.3d 963, 968 (10th Cir. 2004); J.B. v. Valdez, 186 F.3d 1280, 1290 n.7 (10th Cir. 1999); Eisen v. Carlisle & Jacquelin, 417 U.S. at 178.  Since the Court's statement in In re Thornburg Mortgage, Inc. Securities Litigation, however, the Tenth Circuit issued a case stating that district courts should apply a "strict burden of proof" to class certification issues. Roderick v. XTO Energy, 725 F.3d 1213, 1218 (10th Cir. 2013).  This request is consistent with the general trend in the federal judiciary towards using an ordinary preponderance standard to find facts at the class certification stage.  See, e.g., Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc., 546 F.3d 196, 202 (2nd Cir. 2008); In re Hydrogen Peroxide Litig., 552 F.3d 305, 318-20 (3rd Cir. 2008); William B. Rubenstein, Newberg on Class Actions § 7:21 (5th ed.)(tracing the shift in the case law from deferring to plaintiffs' representations to adopting an ordinary preponderance standard, and disclaiming the Court's statement from In re Thornburg Mortgage, Inc. Securities Litigation -- a statement that earlier versions of the treatise espoused). Thus, although the Tenth Circuit has not yet explicitly adopted the preponderance standard for fact-finding in class certification analyses, it most likely will, and the Court will employ that standard here.

analysis, that the prerequisites of Rule 23(a) have been satisfied.  Actual, not presumed, conformance with Rule 23(a) remains indispensable." Frequently that "rigorous analysis" will entail some overlap with the merits of the plaintiff's underlying claim. That cannot be helped. The class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action. Nor is there anything unusual about that consequence: The necessity of touching aspects of the merits in order to resolve preliminary matters, e.g., jurisdiction and venue, is a familiar feature of litigation. Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350-51 (2011)(Scalia, J.). In a subsequent, seemingly contradictory admonition, however, the Supreme Court cautioned district courts not to decide the merits of the case at the class certification stage:

> Although we have cautioned that a court's class-certification analysis must be "rigorous" and may "entail some overlap with the merits of the plaintiff's underlying claim," Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent -- but only to the extent -- that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied.

Amgen Inc. v. Conn. Ret. Plans & Trust Funds, ⸻ U.S. ⸻(2013)(Ginsburg, J.).   To reconcile these two directives, the Court will find facts for the purposes of class certification by the preponderance of the evidence, but will allow the parties to challenge these findings during the subsequent merits stage of this case.  Because of the res judicata effect a class judgment has on absent parties, a court may not simply accept the named parties' stipulation that class certification is appropriate, but must conduct its own independent rule 23 analysis.  See Amchem Prods., Inc. v. Windsor, 521 U.S. at 620-22.   In taking evidence on the question of class certification, the Federal Rules of Evidence apply, albeit in a relaxed fashion.[5]

---

[5] Rule 1101 of the Federal Rules of Evidence provides:

**(a) To Courts and Judges.** These rules apply to proceedings before:

   • United States district courts;

   • United States bankruptcy and magistrate judges;

• United States courts of appeals;

• the United States Court of Federal Claims; and

• the district courts of Guam, the Virgin Islands, and the Northern Mariana Islands.

**(b) To Cases and Proceedings.** These rules apply in:

    • civil cases and proceedings, including bankruptcy, admiralty, and maritime cases;

    • criminal cases and proceedings; and

    • contempt proceedings, except those in which the court may act summarily.

**(c) Rules on Privilege.** The rules on privilege apply to all stages of a case or proceeding.

**(d) Exceptions.** These rules -- except for those on privilege -- do not apply to the following:

    **(1)** the court's determination, under Rule 104(a), on a preliminary question of fact governing admissibility;

    **(2)** grand-jury proceedings; and

    **(3)** miscellaneous proceedings such as:

        • extradition or rendition;

        • issuing an arrest warrant, criminal summons, or search warrant;

        • a preliminary examination in a criminal case;

        • sentencing;

        • granting or revoking probation or supervised release; and

        • considering whether to release on bail or otherwise.

**(e) Other Statutes and Rules.** A federal statute or a rule prescribed by the Supreme Court may provide for admitting or excluding evidence independently from these rules.

Fed. R. Evid. 1101.  It is not immediately obvious whether a class certification hearing is a "civil

case[or] proceeding" under rule 1101(b) -- in which case the Federal Rules of Evidence apply -- or a "miscellaneous proceeding" under rule 1101(d)(3) -- in which case the Rules do not apply. The Tenth Circuit does not appear to have addressed this question, but most courts have concluded that the Federal Rules of Evidence do not apply to class certification hearings. See Paxton v. Union Nat'l Bank, 688 F.2d 552, 562, n. 14 (8th Cir. 1982)(Heaney, J.)("Hearsay testimony may be admitted to demonstrate typicality." (citing Donaldson v. Pillsbury Co., 554 F.2d 825, 830 n. 3 (8th Cir.1977)(Webster, J.))); Bell v. Addus Healthcare, Inc., No. C06-5188, 2007 WL 3012507, at *3 (W.D. Wash. Oct. 12, 2007)(Bryan, J.)("[T]he Court is still not persuaded that it must apply the traditional rules . . . [to] evidence in support of class certification."); Fisher v. Ciba Specialty Chems. Corp., 238 F.R.D. 273, 279 (S.D. Ala. 2006)(Steele, J.)("[T]he Federal Rules of Evidence are not stringently applied at the class certification stage because of the preliminary nature of such proceedings. Courts confronted with Rule 23 issues may consider evidence that may not ultimately be admissible at trial."); id. at 279, n. 7 ("[D]efendants proffered . . . that the Federal Rules of Evidence should be rigorously applied . . . . [D]efendants came forward with not a single case supporting their position that those Rules should be stringently enforced."); Rockey v. Courtesy Motors, Inc., 199 F.R.D. 578, 582 (W.D. Mich. 2001)(Scoville, J.); In re Hartford Sales Practices Litig., 192 F.R.D. 592, 597 (D. Minn. 1999)(Kyle, J.); Thompson v. Bd. of Educ. of Romeo Cmty. Sch., 71 F.R.D. 398, 402 n.2 (W.D. Mich. 1976)(Fox, J.), rev'd on other grounds, 709 F.2d 1200 (6th Cir. 1983). See also Eisen, 417 U.S. at 178 ("[W]e might note that a preliminary determination of the merits [at the class certification stage] may result in substantial prejudice to a defendant, since of necessity it is not accompanied by the traditional rules and procedures applicable to civil trials."). But see Mars Steel Corp. v. Cont'l Bank, N.A., 880 F.2d 928, 937-38 (7th Cir. 1989)(Easterbrook, J.)(holding that the Federal Rules of Evidence apply to class settlement fairness hearings); In re Fine Paper Antitrust Litig., 751 F.2d 562, 584 (3rd Cir. 1984)(Gibbons, J.)("[P]lainly, the requirement of an evidentiary hearing [to resolve attorneys' claims for fees from an equitable fund] demands the application in that hearing, of the Federal Rules of Evidence." (citing no cases)); Soutter v. Equifax Info. Servs. LLC, 299 F.R.D. 126, 129 (E.D. Va. 2014)(Payne, J.)("The Federal Rules of Evidence . . . 'apply to proceedings in United States courts,' subject to certain exceptions not applicable here. A motion for class certification is, without doubt, such a proceeding."); Pecover v. Elec. Arts Inc., No. C08-2820 VRW, 2010 WL 8742757, at *2 (N.D. Cal. Dec. 21, 2010) (Walker, J.)("There seems to be nothing in the Federal Rules of Evidence or in the Federal Rules of Civil Procedure to suggest that class action certification proceedings present an exception to FRE 1101 or that the Federal Rules of Evidence carry different meaning in the class action certification context than elsewhere."); Lewis v. First Am. Title Ins. Co., 265 F.R.D. 536, 544 (D. Idaho 2010)(Lodge, J.)("[T]he FRE and the minimal case law available support First American's position that the FRE apply generally at the class certification stage." (citing no cases)); McLaughlin on Class Actions § 3:14 (10th ed.)("When conducting its rigorous analysis of whether a class should be certified, the Court should apply the Rules of Evidence.").

     The Supreme Court, however, dropped an important clue in Wal-Mart indicating that the Federal Rules of Evidence apply in class certification hearings: "The District Court concluded that Daubert did not apply to testimony at the certification stage of class-action proceedings. We doubt that is so . . . ." 131 S. Ct. at 2553-54 (citation to the district court opinion omitted). The Court is reticent to read too much into this passing reference, but, considering the issue on its own, concludes that the Federal Rules of Evidence apply to class certification hearings. First of

all, under rule 1101(b), the Federal Rules of Evidence apply to "civil cases and proceedings"; a class action is a civil case, and the class certification hearing is a civil proceeding.  If there were no exceptions, the Federal Rules of Evidence would apply.  Hence, if the Federal Rules of Evidence do not apply, class certification hearings must fit within one of the exceptions.  All of the exceptions specifically listed in rule 1101(d)(2) and (d)(3) are criminal; only rule 1101(d)(1) clearly covers civil cases -- and it covers criminal cases, as well.  Rule 1101(d)(1) encompasses the common-sense rule that the court can consider inadmissible hearsay for the limited purpose of determining, under rule 104(a), "any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible."  Fed. R. Evid. 104(a).  A class certification hearing is not a hearing to decide the admissibility of evidence, but whether the case should proceed as a class under rule 23; in that sense, it is more like a hearing under rule 12(b)(6) or rule 56 than one to determine admissibility under the rules of evidence.  Similarly, a class certification hearing does not seem to be similar to the miscellaneous criminal proceedings that rule 1101(d)(3) lists.  There may be a public policy need to dispense with the formalities of the rules of evidence when making the potentially life-and-death decisions concerning: (i) whether to release a criminal defendant on bail when he or she may present a danger to the public; (ii) whether to revoke probation or grant a defendant release after he or she has allegedly violated the terms of his or her release; (iii) how long to sentence a defendant who may be a danger to the public; (iv) whether to extradite a defendant out of the court's jurisdiction, where the court may never see the defendant again, and where the defendant may not be treated fairly; and (v) whether to grant an arrest warrant, criminal summons, or search warrant -- decisions that are made ex parte and often under time constraints.  The similarity of a class certification hearing to a trial suggests that a class certification hearing is not a "miscellaneous proceeding such as" a hearing on sentencing, extradition, preliminary examination, probation violation, or setting bail.

Class certification is an important stage of a case: a certified class action often settles, often for a large amount of money; a rejected or precertification class action is difficult to settle -- except for the often miniscule value of the claims of the individual class representatives -- because res judicata does not attach to the absent class members unless and until the class is certified. The importance of the class certification determination led Congress, the Supreme Court, and the drafters of the Rules to avail litigants to an interlocutory appeal of the district court's determination -- a rare exception to the final-judgment rule.  See Fed. R .Civ. P. 23(f)("A court of appeals may permit an appeal from an order granting or denying class-action certification under this rule if a petition for permission to appeal is filed with the circuit clerk within 14 days after the order is entered.").  Thus, given the importance of the class certification determination and the evidentiary nature of the hearing, the Court concludes that the Federal Rules of Evidence apply.  On the other hand, the sole decider in class certification hearings is a judge, and not a jury. Judges may be better equipped to properly weigh the value of hearsay and irrelevant evidence than juries.  Moreover, there is no practical way to screen a presiding judge entirely from hearing inadmissible evidence, as it is the judge who must decide the threshold question of admissibility.  It is, thus, perhaps more realistic and more honest for the judge to consider all but the most egregiously inadmissible pieces of evidence as they are presented, and factor any evidentiary infirmity into the weight he or she gives to them.

The parties have to decide how to put on their cases; if they want to object to each other's evidence, it may make their presentations difficult.  On the other hand, if the parties decide to make objections, the Court will do its job and decide the objections under the Federal Rules of

**1. *Requirements Applicable to All Classes: Rule 23(a).***

2. All classes must satisfy the prerequisites of rule 23(a):

**(a) Prerequisites.** One or more members of a class may sue or be sued as representative parties on behalf of all members only if:

>   **(1)** the class is so numerous that joinder of all members is impracticable;

>   **(2)** there are questions of law or fact common to the class;

>   **(3)** the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

>   **(4)** the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).  "A party seeking to certify a class is required to show . . . that all the requirements of [rule 23(a) ] are clearly met."  Reed v. Bowen, 849 F.2d 1307, 1309 (10th Cir. 1988).  "Although the party seeking to certify a class bears the burden of proving that all the requirements of Rule 23 are met, the district court must engage in its own 'rigorous analysis' of whether 'the prerequisites of Rule 23(a) have been satisfied.'"  Shook v. El Paso Cnty., 386 F.3d 963, 968 (10th Cir. 2004) (quoting Gen. Tel. Co. of the S.W. v. Falcon, 457 U.S. 147, 161, (1982))(citing Reed v. Bowen, 849 F.2d at 1309).  These four requirements are often referenced as numerosity, commonality, typicality, and adequacy, respectively.

>   **1.** <u>**Numerosity.**</u>

>   2. Rule 23(a)(1) requires that the class membership be sufficiently large to warrant a class action, because the alternative of joinder is impracticable.  Some courts have held that numerosity may be presumed at a certain number; the Tenth Circuit, however, "has never

---

Evidence, not some other standard.

adopted such a presumption." Trevizo v. Adams, 455 F.3d 1155, 1162 (10th Cir. 2006). "The Tenth Circuit has stated that there is 'no set formula' to determine whether the numerosity requirement is met; instead, it is a fact-specific inquiry best left to the district court's discretion." Gonzales v. City of Albuquerque, No. CIV 09-0520 JB/RLP, 2010 WL 4053947, at *7 (D. N.M. Aug. 21, 2010)(Browning, J.)(quoting Rex v. Owens, 585 F.2d 432, 436 (10th Cir. 1978)). Cf. Mullen v. Treasure Chest Casino, LLC, 186 F.3d 620, 624 (5th Cir. 1999)(finding that proposed class consisting of "100 to 150 members . . . is within the range that generally satisfies the numerosity requirement"). In determining whether a proposed Class meets the numerosity requirement, "the exact number of potential members need not be shown," and a court "may make 'common sense assumptions' to support a finding that joinder would be impracticable." Neiberger v. Hawkins, 208 F.R.D. 301, 313 (D. Colo. 2002)(citation omitted). See Bittinger v. Tecumseh Prods. Co., 123 F.3d 877, 884 n. 1 (6th Cir. 1997)(noting that rule 23(a)(1) is not a "strict numerical test"; holding, however, that where class comprises over 1,100 persons, suggestion that joinder is not impractical is "frivolous")(citation omitted); Robidoux v. Celani, 987 F.2d 931, 936 (2nd Cir. 1993)("[T]he difficulty in joining as few as 40 putative class members should raise a presumption that joinder is impracticable."(citation omitted)).

3.      "Satisfaction of the numerosity requirement does not require that joinder is impossible, but only that plaintiff will suffer a strong litigational hardship or inconvenience if joinder is required." Cook v. Rockwell Int'l Corp., 151 F.R.D. 378, 384 (D. Colo. 1993)(Kane, J.). See Robidoux, 987 F.2d at 935("Impracticable does not mean impossible."). The Court has previously found that joinder of "several hundred tenants and homeowners" would be impracticable, and thus the proposed class met rule 23(a)(1)'s numerosity requirement. Lowery v. City of Albuquerque, 273 F.R.D. at 683. At the other end of the spectrum, the Court found

that a class of 6,100 members, in a securities action, was so numerous that joinder was impracticable. See Lane v. Page, 272 F.R.D. 558, 574 (D. N.M. 2011)(Browning, J.). See also Thompson v. Jiffy Lube Intern., Inc., 250 F.R.D. 607, 620 (D. Kan. 2008)(Brown, J.)(finding that the numerosity requirement is met by a proposed class seeking injunctive relief that constituted "at least tens of millions of members," and by a proposed class seeking damages that constitutes at least 4,900 members).

### 2.   **Commonality**.

4.      Rule 23(a)(2) requires that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2) (emphasis added). Even "factual differences in the claims of the individual putative class members should not result in a denial of class certification where common questions of law exist." In re Intelcom Group Sec. Litig., 169 F.R.D. 142, 148 (D. Colo. 1996)(Daniel, J.). See Adamson v. Bowen, 855 F.2d 668, 676 (10th Cir.1988)("That the claims of individual putative class members may differ factually should not preclude certification under Rule 23(b)(2) of a claim seeking the application of a common policy."); Lopez v. City of Santa Fe, 206 F.R.D. 285, 289 (D. N.M. 2002)(Vázquez, J.)("Commonality requires only a single issue common to the class, and the fact that 'the claims of individual putative class members may differ factually should not preclude certification under rule 23(b)(2) of a claim seeking the application of a common policy.'" (citations omitted)). A single common question will suffice to satisfy rule 23(a)(2), but the question must be one "that is central to the validity of each one of the claims." Wal-Mart v. Dukes, 564 U.S. at 350-51.

5.      "The commonality requirement has been applied permissively in securities fraud litigation." In re Initial Pub. Offering Sec. Litig., 227 F.R.D. 65, 87 (S.D.N.Y. 2004). "Securities cases often involve allegations of common courses of fraudulent conduct, which can be sufficient

to satisfy the commonality requirement."  5 Jerold S. Solovy, Ronald L. Marmer, Timothy J.

Chorvat & David M. Feinberg, Moore's Federal Practice § 23.23[4][b], at 23-77 (3d ed. 2004).

"Where the facts as alleged show that Defendants' course of conduct concealed material

information from an entire putative class, the commonality requirement is met."  In re Oxford

Health Plans, Inc. Sec. Litig., 191 F.R.D. 369, 374 (S.D.N.Y. 2000).   Accord Initial Pub.

Offering, 227 F.R.D. at 87 ("In general, where putative class members have been injured by

similar material misrepresentations and omissions, the commonality requirement is satisfied.").

6.    The commonality requirement was widely perceived to lack teeth before the

Supreme Court's decision in Wal-Mart v. Dukes, which grafted the following requirements onto

rule 23(a)(2): (i) that the common question is central to the validity of each claim that the

proposed class brings; and (ii) that the common question is capable of a common answer.  See

Wal-Mart v. Dukes, 564 U.S. at 350-51.  In that case, a proposed class of about 1.5 million

current and former Wal-Mart employees sought damages under Title VII for Wal-Mart's alleged

gender-based discrimination.  See 564 U.S. at 347.  Wal-Mart, however, had no centralized

company-wide hiring or promotion policy, instead opting to leave personnel matters to the

individual store managers' discretion.  See 564 U.S. at 347-48.  The plaintiffs argued that,

although no discriminatory formal policy applied to all proposed class members, "a strong and

uniform 'corporate culture' permits bias against women to infect, perhaps subconsciously, the

discretionary decision making of each one of Wal-Mart's thousands of managers -- thereby

making every [proposed class member] the victim of one common discriminatory practice."  564

U.S. at 348.  The Supreme Court disagreed that such a theory constitutes a common question

under rule 23(a)(2).

> The crux of this case is commonality -- the rule requiring a plaintiff to show that
> "there are questions of law or fact common to the class."  Rule 23(a)(2). That

language is easy to misread, since "[a]ny competently crafted class complaint literally raises common 'questions.'"  Nagareda, <u>Class Certification in the Age of Aggregate Proof</u>, 84 N.Y.U. L. Rev. 97, 131-132 (2009). For example: Do all of us plaintiffs indeed work for Wal-Mart?  Do our managers have discretion over pay? Is that an unlawful employment practice?  What remedies should we get?  Reciting these questions is not sufficient to obtain class certification.  Commonality requires the plaintiff to demonstrate that the class members "have suffered the same injury," <u>Falcon</u>, 102 S. Ct. at 2364.  This does not mean merely that they have all suffered a violation of the same provision of law. Title VII, for example, can be violated in many ways -- by intentional discrimination, or by hiring and promotion criteria that result in disparate impact, and by the use of these practices on the part of many different superiors in a single company.  Quite obviously, the mere claim by employees of the same company that they have suffered a Title VII injury, or even a disparate-impact Title VII injury, gives no cause to believe that all their claims can productively be litigated at once.  Their claims must depend upon a common contention -- for example, the assertion of discriminatory bias on the part of the same supervisor.  That common contention, moreover, must be of such a nature that it is capable of classwide resolution -- which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.

What matters to class certification . . . is not the raising of common "questions" -- even in droves -- but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation.  Dissimilarities within the proposed class are what have the potential to impede the generation of common answers.

<u>Wal-Mart v. Dukes</u>, 564 U.S. at 350-51 (emphasis in original)(quoting <u>Nagareda</u>, <u>supra</u>, at 132).

In <u>EQT Production Co. v. Adair</u>, the Fourth Circuit stated:

We first review the aspects of the district court's analysis that apply to all five royalty underpayment classes.

At bottom, the district court believed that both the commonality and predominance requirements of Rule 23 were satisfied by the same basic fact: the defendants employed numerous uniform practices related to the calculation and payment of CBM royalties.  These common practices are not irrelevant to Rule 23(b)'s predominance requirement.  But we hold that the district court abused its discretion by failing to consider the significance of this common conduct to the broader litigation.

The district court identified numerous common royalty payment practices.  For example, it noted that EQT sells all of the CBM it produces in Virginia to an affiliate, EQT Energy, and that "all royalty owners within the same field have been paid royalties based on the same sales price for the CBM." With respect to

> CNX, it noted that CNX "has uniform policies and procedures which governed its calculation of CBM revenues," and that "it has deducted severance and license taxes when calculating royalties since January 1, 2004."
>
> That the defendants engaged in numerous common practices may be sufficient for commonality purposes. As noted above, the plaintiffs need only demonstrate one common question of sufficient importance to satisfy Rule 23(a)(2).

764 F.3d at 366 (citations omitted).

7.      In Wal-Mart v. Dukes, Justice Scalia stated: "Wal-Mart is entitled to individualized determinations of each employee's eligibility for backpay."  564 U.S. at 346. From this observation, he then concluded:

> Because the Rules Enabling Act forbids interpreting Rule 23 to "abridge, enlarge or modify any substantive right," 28 U.S.C. § 2072(b), a class cannot be certified on the premise that Wal-Mart will not be entitled to litigate its statutory defenses to individual claims.  And because the necessity of that litigation will prevent backpay from being "incidental" to the classwide injunction, respondents' class could not be certified even assuming, arguendo, that "incidental" monetary relief can be awarded to a 23(b)(2) class.

Wal-Mart v. Dukes, 564 U.S. at 361.  Thus, the common question or questions cannot be "incidental" nor can the plaintiff submit a long list of "incidental" questions or issues, and say that they predominate over the real issues to be used.

**3.      Typicality.**

8.      Rule 23(a)(3) requires that the named representative's claims be typical of the class' claims.  See Fed. R. Civ. P. 23(a)(3).  The typicality requirement ensures that absent proposed class members are adequately represented by evaluating whether the named plaintiff's interests are sufficiently aligned with the class' interest.  See Baby Neal ex rel. Kanter v. Casey, 43 F.3d 48, 57 (3d Cir. 1994); Nicodemus v. Union Pac. Corp., 204 F.R.D. 479, 490 (D. Wyo. 2001).  The Supreme Court has noted that "[t]he commonality and typicality requirements of Rule 23(a) tend to merge."  Falcon, 457 U.S. at 157 n.13.  "Provided the claims of Named

- 42 -

Plaintiffs and putative class members are based on the same legal or remedial theory, differing fact situations of the putative class members do not defeat typicality." DG v. Devaughn, 594 F.3d 1188, 1198 (10th Cir. 2010)(citing Adamson v. Bowen, 855 F.2d 668, 676 (10th Cir. 1988)).  "[L]ike commonality, typicality exists where . . . all putative class members are at risk of being subjected to the same harmful practices, regardless of any class member's individual circumstances."  DG v. Devaughn, 594 F.3d at 1199.  Factual differences among some of the proposed class members will "not defeat typicality under Rule 23(a)(3) so long as the claims of the class representative and putative class members are based on the same legal or remedial theory."  Adamson v. Bowen, 855 F.2d 668, 676 (10th Cir. 1988).  See Penn v. San Juan Hosp., Inc., 528 F.2d 1181, 1189 (10th Cir. 1975)("It is to be recognized that there may be varying fact situations among individual members of the class and this is all right so long as the claims of Plaintiffs and the other putative class members are based on the same legal or remedial theory.").  Accordingly, differences in the amount of damages will not defeat typicality.  See Harrington v. City of Albuquerque, 222 F.R.D. 505, 511 (D.N.M. 2004)(Hansen, J.).

9.      "The United States Court of Appeals for the Tenth Circuit has said that the typicality requirement is satisfied if there are common questions of law or fact."  Gianzero v. Wal-Mart Stores Inc., No. CIV 09-00656 REB/BNB, 2010 WL 1258071, at *3 (D. Colo. March 29, 2010)(Boland, J.)(citing Milonas v. Williams, 691 F.2d 931, 938 (10th Cir. 1982))("In determining whether the typicality and commonality requirements have been fulfilled, either common questions of law or fact presented by the class will be deemed sufficient."); Adamson v. Bowen, 855 F.2d at 676 ("[D]iffering fact situations of putative class members do not defeat typicality under Rule 23(a)(3) so long as the claims of the class representative and putative class members are based on the same legal or remedial theory." (citations omitted)).

- 43 -

4.      **Adequacy**.

10.     Rule 23(a)(4) requires that "representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  This requirement protects the due-process interests of unnamed proposed class members -- whom any judgment binds. <u>See Matsushita Elec. Indus. Co. v. Epstein</u>, 516 U.S. 367, 379 n. 5 (1996)(characterizing adequacy of representation as a constitutional requirement); <u>Lile v. Simmons</u>, 143 F. Supp. 2d 1267, 1277 (D. Kan. 2001)(Vratil, J.)("Due process requires that the Court 'stringently' apply the competent representation requirement because putative class members are bound by the judgment (unless they opt out), even though they may not actually be aware of the proceedings.").   "The requirement of fair and adequate representation is perhaps the most important of the criteria for class certification set forth in Rule 23(a)."  <u>Miller ex rel. S.M. v. Bd. of Educ.</u>, 455 F. Supp. 2d 1286, 1294 (D. N.M. 2006)(Armijo, J.).  <u>See Cobb v. Avon Prods., Inc.</u>, 71 F.R.D. 652, 654 (W.D. Pa. 1976)("Adequacy of the representative is of monumental importance since representation demands undiluted loyalty to the class interests. . . .").  The Tenth Circuit has identified two questions relevant to the adequacy of representation inquiry: (i) whether the named plaintiffs and their counsel have any conflicts with other proposed class members; and (ii) whether the named plaintiffs and their counsel will vigorously prosecute the action on the class' behalf.  <u>See Rutter & Wilbanks Corp. v. Shell Oil Co.</u>, 314 F.3d 1180, 1187-88 (10th Cir. 2002). In considering this second question, the experience and competence of the attorney representing the class may inform the court's analysis.  <u>See Lopez</u>, 206 F.R.D. at 289-90.  Although Tenth Circuit precedent suggests that the adequacy-of-counsel analysis is conducted as a part of the rule 23(a)(4) inquiry, this analysis has likely now been moved entirely to rule 23(g).[6]  This

---

[6]The 2003 amendments to rule 23 created rule 23(g), entitled "class counsel." Fed. R.

difference matters little, except that now district courts should not refuse to certify a class on the basis of inadequacy of counsel alone.

11.     The Supreme Court "has repeatedly held [that] a class representative must be part of the class and 'possess the same interest and suffer the same injury' as the putative class members." E. Tex. Motor Freight Sys. Inc. v. Rodriguez, 431 U.S. 395, 403 (1977)(quoting Schlesinger v. Reservists Comm. to Stop the War, 418 U.S. 208, 216 (1974)).   Courts have found that intra-class conflicts "may negate adequacy under Rule 23(a)(4)."   Langbecker v. Elec. Data Sys. Corp., 476 F.3d 299, 315 n.28 (5th Cir. 2007)(holding that the district court erred in certifying a class without evaluating intra-class conflicts).   See Pickett v. Iowa Beef Processors, 209 F.3d 1276, 1280 (11th Cir. 2000)(finding that representation was inadequate where the class included those "who claim harm from the very acts from which other putative class members benefitted"); Broussard v. Meineke Discount Muffler Shops, Inc., 155 F.3d 331, 344 (4th Cir. 1998)(holding that the current franchisees who had an interest in the continued viability of the franchiser had an inherent conflict with former franchisees whose only interest was in the maximization of damages); Alston v. Va. High Sch. League, Inc., 184 F.R.D. 574, 579 (W.D. Va. 1999)(ruling that a class of all high school female athletes could not be certified -- even if the alleged conduct of the defendant school system was discriminatory -- when some female athletes did not share the same goals or interests as the named female plaintiffs, because those unnamed female athletes were satisfied with and/or benefitted from the alleged discriminatory treatment).

12.     On the other hand, "only a conflict that goes to the very subject matter of the

Civ. P. 23(g).   This subsection contains its own adequacy-of-counsel analysis. See Fed. R. Civ. P. 23(g)(1)-(2).

litigation will defeat a party's claim of representative status. Beyond that straightforward proposition, defining the level of antagonism or conflict that should preclude class certification is a more difficult proposition." 7A Charles Alan Wright, Arthur A. Miller & Mary K. Kane, Federal Practice & Procedure § 1768, at 389-93 (3d ed. 2005). "Though a plaintiff cannot be an adequate representative if he or she has a conflict of interest with putative class members, not every potential disagreement between a class representative and the putative class members will stand in the way of a class suit." Lowery v. City of Albuquerque, 273 F.R.D. at 680 (citation omitted).

### 5. Different Categories of Classes: Rule 23(b).

13.    Once the court finds that the threshold requirements have been met, "it must then examine whether the class falls within at least one of three categories of suits set forth in Rule 23(b)." Adamson v. Bowen, 855 F.2d at 675. See DG v. Devaughn, 594 F.3d at 1199 ("In addition to satisfying Rule 23(a)'s requirements, the class must also meet the requirements of one of the types of classes described in subsection (b) of Rule 23."). Rule 23(b) provides that a class action is appropriate if the threshold requirements are satisfied, and the case falls into one or more of three categories:

> **(b) Types of Class Actions.** A class action may be maintained if Rule 23(a) is satisfied and if:
>
> > **(1)** prosecuting separate actions by or against individual putative class members would create a risk of:
> >
> > > **(A)** inconsistent or varying adjudications with respect to individual putative class members that would establish incompatible standards of conduct for the party opposing the class; or
> > >
> > > **(B)** adjudications with respect to individual putative class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;

**(2)** the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or

**(3)** the court finds that the questions of law or fact common to putative class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:

> **(A)** the putative class members' interests in individually controlling the prosecution or defense of separate actions;

> **(B)** the extent and nature of any litigation concerning the controversy already begun by or against putative class members;

> **(C)** the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

> **(D)** the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b). "Only one of rule 23(b)'s subdivisions must be satisfied to meet the class-action requirements." Gonzales v. City of Albuquerque, No. CIV 09-0520 JB/RLP, 2010 WL 4053947, at *11 (D.N.M. Aug. 21, 2010)(Browning, J. )(citing Carpenter v. Boeing, Co., 456 F.3d 1183, 1187 (10th Cir. 2006)(stating that the district court must determine whether a suit "falls within one of the categories of actions maintainable as class actions")).

14.    The three categories of class actions -- really four, as rule 23(b)(1) contains two subcategories, known as (b)(1)(A) and (b)(1)(B) class actions -- are not of equal utility.  Class actions under (b)(1) can be certified only in very particular circumstances.  Class actions under (b)(2) are broadly available, but are only capable of seeking injunctive or declaratory relief, and not damages.  Far and away the most controversial class action category, (b)(3), can be brought for class-wide damages, injunctive relief, declaratory relief, or any combination thereof.  Class actions under (b)(3) always require notice to all proposed class members of certification of the

class, and those individuals must be given the opportunity to opt out if they so desire. See Fed. R. Civ. P. 23(c)(2)(B); Phillips Petrol. Co. v. Shutts, 472 U.S. at 812, ("[W]e hold that due process requires at a minimum that an absent plaintiff be provided with an opportunity to remove himself from the class by executing and returning an 'opt out' or 'request for exclusion' form to the court."). The other class action categories, however, are ordinarily mandatory, and neither notice nor opportunity to opt out needs to be given. See Fed. R. Civ. P. 23(c)(2)(B); Phillips Petrol. Co. v. Shutts, 472 U.S. at 811 n. 3, (limiting the constitutional requirement of an opt-out notice "to those class actions which seek to bind known plaintiffs concerning claims wholly or predominately for money judgments"). The Court will focus on the most important form of class action, the (b)(3) damages class action.[7]

---

[7]The Court will briefly address the other class actions. Rule 23(b)(1) contains two subcategories of class action, (b)(1)(A) actions and (b)(1)(B) actions; a class need satisfy the requirements of only one to be certified. See Fed. R. Civ. P. 23(b)(1). Class actions under (b)(1)(A) are designed to avoid the situation in which a defendant subject to suit by multiple plaintiffs is ordered to undertake incompatible courses of conduct as a result of the non-centralized nature of the adjudication. See Fed. R. Civ. P. 23(b)(1)(A). "Incompatible" means more than simply inconsistent. A situation in which, e.g., a defendant was ordered to pay $10,000.00 to a plaintiff in one case, was ordered to pay ten million dollars to another plaintiff in an identical or similar case, and was found to not be at fault at all in yet another case, may be inconsistent, but it does not create "incompatible standards of conduct for the party opposing the class." Fed. R. Civ. P. 23(b)(1)(A). Such alleged inconsistency is a normal and expected part of the system of individualized adjudication that the judiciary uses to apply a uniform set of laws onto varied factual settings. What (b)(1)(A) is designed to avoid is injunctive or declaratory "whipsawing," in which, e.g., one court orders a school district to close an underperforming inner-city school and bus its students to suburban schools, and another court orders the district to keep the school open and bus suburban students in to the school.

Class actions under (b)(1)(B) serve a similar role, but apply when varying adjudications would result in practically -- rather than legally -- incompatible judgments. See Fed. R. Civ. P. 23(b)(1)(B). Rule (b)(1)(B) applies when the defendant has possession or control of a res -- a pot of money or thing that constitutes the relief that the proposed class seeks -- and the relief sought by all the individual members of the proposed class would more than exhaust the res. For example, if a Ponzi scheme operator took ten billion dollars of investors' money, and, upon law enforcement's discovery of the scheme, had only six billion dollars remaining, then the individual investors' claims to recover their rightful share would add up to four billion dollars more than existed in the res. Thus, the court might certify a(b)(1)(B) class action to ensure that

_____

the custodian of the <u>res</u> does not pay out the entire res to the first investors to file suit, but, instead, distributes the <u>res</u> fairly among all investors -- most likely by paying each investor 60% of his or her lost investment.

The two subcategories of (b)(1) class action have other things in common as well.  Both exist, in a sense, for the defendant's benefit -- at least relative to (b)(2) and (b)(3) class actions -- and are rarely brought, in part because plaintiffs have little incentive to bring them.  In the (b)(1)(B) example, each investor hopes to recover the full value of his or her investment, not a 60% value, and thus is incentivized to file as an individual. In the (b)(1)(A) example, the plaintiff seeking to close down the school (i) does not care about the inconsistent obligations of the school district, and (ii) would rather not be joined in a class action with plaintiffs who want to keep the school open.  Last, (b)(1) class actions, along with (b)(2) class actions, are mandatory: if certified, no person covered under the class definition may opt out of it or pursue his or her own individual claim. As such, no notice needs to be given to the class members that they are part of ongoing litigation, although the certifying court may elect to direct notice in appropriate circumstances. <u>See</u> Fed. R. Civ. P. 23(c)(2)(A).

Class actions under (b)(2) provide for injunctive or declaratory relief when a defendant has "acted or refused to act on grounds that apply generally to the class."  Fed. R. Civ. P. 23(b)(2).

> The key to the (b)(2) class is "the indivisible nature of the injunctive or declaratory remedy warranted -- the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." Nagareda, <u>supra</u>, at 132.  In other words, Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class.  It does not authorize class certification when each individual class member would be entitled to a *different* injunction or declaratory judgment against the defendant. Similarly, it does not authorize class certification when each class member would be entitled to an individualized award of monetary damages.

<u>Wal-Mart v. Dukes</u>, 564 U.S. at 357 (emphasis in original).  The (b)(2) class action was invented for the purpose of facilitating civil rights suits, and much of its use is in that field today.  <u>See</u> William B. Rubenstein, <u>Newberg on Class Actions</u> § 4:26 (5th ed.)("<u>Newberg</u>").  The (b)(2) class action allows civil rights litigants to advocate on behalf of all similarly situated individuals, such as a disenfranchised black voter representing a class of all black voters within an unconstitutionally drawn district or a jail inmate representing all inmates in an overcrowding case.  Anyone familiar with the nation's seminal civil rights cases, however, knows that many of them are not brought as class actions, which raises a question:

> [W]hy would anyone ever bring one? . . . .  Th[is] inquiry is generated because if an individual litigant pursues an individual case for injunctive relief and prevails, she can generally <u>get</u> all of the remedy that she needs without going through the hurdles of certifying a class.  For example, to return to <u>Brown v. Board of Education</u>, once Linda Brown prevailed on her race discrimination claim, her remedy -- a desegregated school -- was hers to pursue.  Although that remedy

15.     To satisfy rule 23(b)(3), the court must find "that the questions of law or fact common to the members of the class <u>predominate</u> over any questions affecting only individual members, and that a class action is <u>superior</u> to other available methods for the fair and efficient adjudication of the controversy."   Fed. R. Civ. P. 23(b)(3)(emphases added).   Rule 23(b)(3) provides that "[t]he matters pertinent to these findings include": (i) the interest of class members in individually controlling the prosecution or defense of separate actions; (ii) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (iii) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (iv) the difficulties likely to be encountered in the management of a class

---

would affect many other persons not a part of her litigation, hence making class certification appropriate, there is no requirement that to secure that remedy, she had to file a class action.

Nonetheless, social change advocates tend to pursue class certification under Rule 23(b)(2) for several reasons.  First, and perhaps most importantly, Linda Brown will likely graduate from school long before her case ends; if hers is simply an individual action, it will become moot and risk dismissal.  Class certification, however, constitutes an exception to the mootness doctrine in certain circumstances.  Second, the scope of the plaintiff's relief is likely augmented by certifying a class.  It is arguable that all that Linda Brown would have been able to secure as a remedy for her individual claim was a desegregated school for herself, not for students throughout the entire school district; there is some relationship between the scope of the class and the scale of the remedy.  Third, it is often the case that the attorneys pursuing civil rights actions are doing so as public interest lawyers paid by an organization like the NAACP Legal Defense Fund or the American Civil Liberties Union (ACLU); they may therefore have a financial incentive to pursue a class's case rather than a series of individual cases as they have limited resources, and the economies of scale may argue for a class action suit. Most generally, many civil rights cases are brought as class suits because the attorneys and clients pursuing them conceptualize their efforts in group, not individual, terms.  Thus, while an individual civil rights plaintiff might be able to secure the relief that she seeks without a (b)(2) class, a series of factors may encourage the pursuit of one.

<u>Newberg</u> § 4:26 (footnotes omitted).  Like (b)(1) class actions, (b)(2) class actions are mandatory -- individuals covered under the class definition may not opt out -- and do not require notice to be given to the class.  <u>See</u> Fed. R. Civ. P. 23(c)(2)(A).

action. Fed. R. Civ. P. 23(b)(3)(A)-(D).

### a. __The Predominance Requirement.__

16.    Rule 23(b)(3)'s first requirement is that questions common to the class predominate over those that are individualized.  See Fed. R. Civ. P. 23(b)(3).  A question is common when "the same evidence will suffice for each member to make a prima facie showing," Blades v. Monsanto Co., 400 F.3d 562, 566 (8th Cir. 2005)(citing In re Visa Check/MasterMoney Antitrust Litig., 280 F.3d 124, 136-40 (2nd Cir. 2001)), or when the issue is "susceptible to generalized, class-wide proof," In re Nassau Cnty. Strip Search Cases, 461 F.3d 219, 227 (2d Cir. 2006). A question is individual when "the members of a proposed class will need to present evidence that varies from member to member," Blades v. Monsanto Co., 400 F.3d at 566.  Although a case need not present only common questions to merit certification, and the presence of some individual questions does not destroy predominance, the rule 23(b)(3) predominance requirement is much stricter than the rule 23(a)(1) commonality requirement: the latter requires only that a common question or questions exist; the former requires that the common question or questions predominate over the individual ones.  See Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 623-24 (1997); In re Thornburg Mortg., Inc. Sec. Litig., 912 F. Supp. 2d at 1225 ("The predominance criterion of rule 23(b)(3) is 'far more demanding' than rule 23(a)(2)'s commonality requirement.").  As the Tenth Circuit, addressing a Title VII claim, put it:

> The myriad discriminatory acts that Plaintiffs allege (e.g., failure to promote, failure to train, unequal pay, disrespectful treatment, etc.) each require independent legal analysis, and similarly challenge the predominance requirement of Rule 23(b)(3) if not also the commonality requirement of Rule 23(a).
>
> Although we do not rest our decision upon Rule 23(a), cases that interpret that the commonality requirement of Rule 23(a) illustrate the instant Plaintiffs' inability to satisfy Rule 23(b)(3)'s 'far more demanding' requirement that common issues

predominate.

Monreal v. Potter, 367 F.3d 1224, 1237 (10th Cir. 2004) (Ebel, J.)(footnote omitted).

17.     The predominance question applies to both macro damages -- the total class damages --and to the micro damages -- the individual damages.  In Comcast Corp. v. Behrend, –– U.S. — (2013), the Supreme Court, in a five-to-four decision, in which Justice Scalia wrote the majority opinion, held that the court could not accept as evidence that damages were susceptible of measurement across an entire class -- as rule 23(b)(3) requires for certification of a class on the theory that questions of law or fact common to class members predominate over any questions affecting only individual members -- the regression model which the plaintiffs' expert had developed.  The plaintiffs argued four theories of antitrust violations; one theory was that Comcast Corp.'s activities had an antitrust impact, because Comcast Corp.'s activities reduced the level of competition from "overbuilders," companies that build competing cable networks in areas where an incumbent cable company already operates.  The district court found, among other things, that the damages resulting from overbuilder-deterrence impact could be calculated on a classwide basis.  To establish such damages, the plaintiffs relied solely Dr. James McClave's testimony.  Dr. McClave designed a regression model which compared actual cable prices in the Philadelphia "Designated Market Area" with hypothetical prices that would have prevailed but for Comcast Corp.'s allegedly anticompetitive activities.  The model calculated damages of $875,576,662.00 for the entire class.  As Dr. McClave acknowledged, however, the model did not isolate damages resulting from any one theory of antitrust impact. The district court nonetheless certified the class.

18.     The Third Circuit affirmed the district court decision.   The Third Circuit concluded that the plaintiffs "provided a method to measure and quantify damages on a

classwide basis," finding it unnecessary to decide "whether the methodology was a just and reasonable inference or speculation." 133 S. Ct. at 1433 (quoting Behrend v. Comcast Corp., 655 F.3d 182, 206 (3rd Cir. 2011)). The Supreme Court granted certiorari on the question "[w]hether a district court may certify a class action without resolving whether the plaintiff class had introduced admissible evidence, including expert testimony, to show that the case is susceptible to awarding damages on a class-wide basis." 133 S. Ct. at 1431. Justice Scalia criticized the Court of Appeals' reluctance to entertain arguments against the plaintiffs' damages model "simply because those arguments would also be pertinent to the merits determination. . . ." 133 S. Ct. at 1433.  Justice Scalia said that

> it is clear that, under the proper standard for evaluating certification, respondents' model falls far short of establishing that damages are capable of measurement on a classwide basis. Without presenting another methodology, respondents cannot show Rule 23(b)(3) predominance: Questions of individual damage calculations will inevitably overwhelm questions common to the class.

Comcast Corp. v. Behrend, 133 S. Ct. at 1433.   Justice Scalia stated that, under the Third Circuit's logic, "at the class-certification stage, any method of measurement is acceptable so long as it can be applied classwide, no matter how arbitrary the measurements may be. Such a proposition would reduce rule 23(b)(3)'s predominance requirement to a nullity." 133 S. Ct. at 1433 (emphasis in original).

It is clear that Comcast Corp. v. Behrend applies to classwide damages.  It is less clear that Comcast Corp. v. Behrend's language applies to the determination of individual damages. There are three ways that the Court could deal with Comcast Corp. v. Behrend and the determination of individual damage awards.  First, the Court could decide that Comcast Corp. v. Behrend applies only to classwide damages and is not controlling at all in the determination of individual damages.  Second, the Court could decide that everything that Justice Scalia said

about classwide damages also applies to the determination of individual damages. Third, the Court could decide that Justice Scalia said some things relating to the determination of individual damages, but not the same things that apply to classwide damages.  As to the first option, while much could be said of limiting Justice Scalia's opinion to classwide damages -- even from the language of the opinion and from the wording of the question presented -- the Court is reluctant to say that it has nothing to say that might be relevant to the determination of individual damages awards.  Some of Justice Scalia's concerns about admissible evidence to determine damages -- whether classwide or individual damage awards -- still seems relevant to whether damages are classwide or individual.  While Justice Scalia was not addressing the determination of individual damage awards, some of what he said --and how he said it -- should cause the Court to be cautious in determining a methodology for calculating individual damage awards.  On the other hand, the Court is not convinced that it should or even can apply Comcast Corp. v. Behrend's language to the individual determination of damages as it does to classwide damages.  The dissent stated that "[r]ecognition that individual damages calculations do not preclude class certification under Rule 23(b)(3) is well nigh universal."  133 S. Ct. at 1437 (Ginsburg, J., dissenting).  Justice Scalia did not refute this proposition, and the Court has no reason to think the dissent's statement -- which is accurate -- does not remain good law.  Accordingly, just because each plaintiff and class member may get a different amount and there has to be a separate calculation of each plaintiff's damages does not defeat class certification.

19.    What the Court thinks that Comcast Corp. v. Behrend says that is relevant to the individual determination of damages is threefold.  First, at the class certification stage, the Court cannot ignore how individual damages, if any are appropriate, are to be decided.  In other words, the Court cannot ignore the possible complexities of the individual damages determinations in

making the predominance calculation.  A class can have individual damage calculations, but the Court has to look at the issues of individual damages calculations at the class certification stage. Second, the methodology for all class members needs to be common or, if there are different methodologies for some plaintiffs and class members, the Court must take these differences into account at the class certification stage in the predominance analysis.  In other words, if the Court is going to use different methodologies for different class members, it must decide: (i) whether these differences create questions affecting only individual members; and (ii) whether these individual questions predominate over the questions of law or fact common to the class.  Third, even if the methodology is common to the class, the Court must decide whether it will operate in a consistent way for each individual class member.  The law and methodology may be the same, but when applied to the class, they may create issues for one class member or group of class members that they do not create for other class members or groups.  The predominance analysis must identify precisely the common issues and uncommon issues that application of the class methodology or methodologies raise, and then determine whether, in the total issue mix, the common issues predominate over the individual ones.

20.    A defendant's desire to assert individual counterclaims -- generally speaking, counterclaims, even common ones, are not permitted against absent class members at all -- does not typically defeat predominance.  See Phillips Petrol. Co. v. Shutts, 472 U.S. 797, 810, (1985); Allapattah Servs., Inc. v. Exxon Corp., 333 F.3d 1248, 1260 (11th Cir. 2003).  A defendant's desire to assert individual affirmative defenses also often does not defeat predominance, see Smilow v. Sw. Bell Mobile Sys., Inc., 323 F.3d 32, 39 (1st Cir. 2003)("Courts traditionally have been reluctant to deny class action status under Rule 23(b)(3) simply because affirmative defenses may be available against individual members"), but this statement is less true after Wal-

Mart v. Dukes.[8]   Other recurring individual issues present more serious challenges to

---

[8]The reexamination clause presents more formidable difficulties to polyfurcation. Relatively few appellate judges have invalidated lower-court judgments or class-management plans on this ground, by far the most famous being Judge Posner:

[T]he district judge . . . exceeded his authority [at] the point at which his plan of action proposes to divide the trial of the issues that he has certified for class-action treatment from the other issues involved in the thousands of actual and potential claims of the representatives and members of the class.  Bifurcation and even finer divisions of lawsuits into separate trials are authorized in federal district courts.  And a decision to employ the procedure is reviewed deferentially.  However, as we have been at pains to stress recently, the district judge must carve at the joint.   Of particular relevance here, the judge must not divide issues between separate trials in such a way that the same issue is reexamined by different juries. The problem is not inherent in bifurcation.  It does not arise when the same jury is to try the successive phases of the litigation.  But most of the separate "cases" that compose this class action will be tried, after the initial trial in the Northern District of Illinois, in different courts, scattered throughout the country.  The right to a jury trial in federal civil cases, conferred by the Seventh Amendment, is a right to have juriable issues determined by the first jury impaneled to hear them (provided there are no errors warranting a new trial), and not reexamined by another finder of fact.  This would be obvious if the second finder of fact were a judge.  But it is equally true if it is another jury. In this limited sense, a jury verdict can have collateral estoppel effect.

The plan of the district judge in this case is inconsistent with the principle that the findings of one jury are not to be reexamined by a second, or third, or $n$ th jury. The first jury will not determine liability.  It will determine merely whether one or more of the defendants was negligent under one of the two theories.  The first jury may go on to decide the additional issues with regard to the named plaintiffs. But it will not decide them with regard to the other class members.  Unless the defendants settle, a second (and third, and fourth, and hundredth, and conceivably thousandth) jury will have to decide, in individual follow-on litigation by class members not named as plaintiffs in the Wadleigh [v. Rhone-Poulenc Rorer Inc., 157 F.R.D. 410 (N.D. Ill. 1994)] case, such issues as comparative negligence -- did any class members knowingly continue to use unsafe blood solids after they learned or should have learned of the risk of contamination with HIV? -- and proximate causation.  Both issues overlap the issue of the defendants' negligence. Comparative negligence entails, as the name implies, a comparison of the degree of negligence of plaintiff and defendant.   Proximate causation is found by determining whether the harm to the plaintiff followed in some sense naturally, uninterruptedly, and with reasonable probability from the negligent act of the defendant.  It overlaps the issue of the defendants' negligence even when the state's law does not (as many states do) make the foreseeability of the risk to

predominance, such as: (i) the prima facie element of reliance or due diligence in common-law

fraud and other cases;[9] (ii) differences in the applicable law in a multi-state, state law-based class

---

> which the defendant subjected the plaintiff an explicit ingredient of negligence.  A second or subsequent jury might find that the defendants' failure to take precautions against infection with Hepatitis B could not be thought the proximate cause of the plaintiffs' infection with HIV, a different and unknown blood-borne virus.  How the resulting inconsistency between juries could be prevented escapes us.

In re Rhone-Poulenc Rorer, Inc., 51 F.3d at 1302-03 (citations omitted).

> [9]The advisory committee's notes to rule 23 state that
>
> a fraud perpetrated on numerous persons by the use of similar misrepresentations may be an appealing situation for a class action, and it may remain so despite the need, if liability is found, for separate determination of the damages suffered by individuals within the class.  On the other hand, although having some common core, a fraud case may be unsuited for treatment as a class action if there was material variation in the representations made or in the kinds or degrees of reliance by the persons to whom they were addressed.

Fed. R. Civ. P. 23 advisory committee's notes (citations omitted).

> Despite the generalized concern about the individual nature of the misrepresentations and/or reliance inquiry in fraud cases, there are at least three recurring situations in which courts have found common issues predominant in fraud cases: (1) those in which reliance is common across the class; (2) those in which courts have excused a showing of individual reliance; and (3) those in which the underlying law does not require a showing of individual reliance.

Newberg § 4:58.  Reliance may be a common issue when the same misrepresentation is made to the entire class; some circuits have held that written misrepresentations may be common issues while oral misrepresentations are presumed to be individualized.  See, e.g., Moore v. PaineWebber, Inc., 306 F.3d 1247, 1253 (2nd Cir. 2002)("[T]he Third, Fourth, Fifth, Sixth, and Seventh Circuits . . . have held that oral misrepresentations are presumptively individualized."); In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions, 148 F.3d 283, 319 (3rd Cir. 1998)(certifying class where alleged misrepresentations were written and uniform); Spencer v. Hartford Fin. Servs. Grp., Inc., 256 F.R.D. 284, 297 (D. Conn. 2009)(certifying class where class definition was narrowed to include only those who had received written communications from defendant).  The requirement that the plaintiffs show reliance is most often presumed or excused in so-called fraud-on-the-market securities cases, in which class members -- investors in the defendant company -- are presumed to be rational, fully informed actors who use all of the information available to the general public, but are also presumed to not possess insider information.

actions,[10] <u>Castano v. Am. Tobacco Co.</u>, 84 F.3d 734, 741 (5th Cir. 1996); and (iii) the need to

---

> We have found a rebuttable presumption of reliance in two different circumstances. First, if there is an omission of a material fact by one with a duty to disclose, the investor to whom the duty was owed need not provide specific proof of reliance. Second, under the fraud-on-the-market doctrine, reliance is presumed when the statements at issue become public. The public information is reflected in the market price of the security. Then it can be assumed that an investor who buys or sells stock at the market price relies upon the statement.

<u>Stoneridge Inv. Partners, LLC v. Scientific-Atlanta</u>, 552 U.S. 148, 159, (2008)(citing <u>Affiliated Ute Citizens of Utah v. United States</u>, 406 U.S. 128, 153 (1972); <u>Basic Inc. v. Levinson</u>, 485 U.S. 224, 245 (1988)).

[10]In <u>In re Bridgestone/Firestone, Inc.</u>, 288 F.3d 1012 (7th Cir. 2002), Judge Easterbrook, in a pre-<u>Wal-Mart/Comcast</u> opinion, stated:

> No class action is proper unless all litigants are governed by the same legal rules. Otherwise the class cannot satisfy the commonality and superiority requirements of Fed. R. Civ. P. 23(a), (b)(3). Yet state laws about theories such as those presented by our plaintiffs differ, and such differences have led us to hold that other warranty, fraud, or products-liability suits may not proceed as nationwide classes.

288 F.3d at 1015. Judge Easterbrook then discussed how variations in tires defeats class treatment:

> Because these claims must be adjudicated under the law of so many jurisdictions, a single nationwide class is not manageable. Lest we soon see a Rule 23(f) petition to review the certification of 50 state classes, we add that this litigation is not manageable as a class action even on a statewide basis. About 20% of the Ford Explorers were shipped without Firestone tires. The Firestone tires supplied with the majority of the vehicles were recalled at different times; they may well have differed in their propensity to fail, and this would require sub-subclassing among those owners of Ford Explorers with Firestone tires. Some of the vehicles were resold and others have not been; the resales may have reflected different discounts that could require vehicle-specific litigation. Plaintiffs contend that many of the failures occurred because Ford and Firestone advised the owners to underinflate their tires, leading them to overheat. Other factors also affect heating; the failure rate (and hence the discount) may have been higher in Arizona than in Alaska. Of those vehicles that have not yet been resold, some will be resold in the future (by which time the tire replacements may have alleviated or eliminated any discount) and some never will be resold. Owners who wring the last possible mile out of their vehicles receive everything they paid for and have claims that differ from owners who sold their Explorers to the second-hand

determine individual personal injury damages, which presents such a challenge to predominance that class certification of mass tort claims is now exceedingly rare.  See Amchem Prods., Inc. v. Windsor, 521 U.S. at 625.

21.    There is little uniform guidance on how to assess when common issues

---

market during the height of the publicity in 2000.  Some owners drove their SUVs off the road over rugged terrain, while others never used the "sport" or "utility" features; these differences also affect resale prices.

Firestone's tires likewise exhibit variability; that's why fewer than half of those included in the tire class were recalled.  The tire class includes many buyers who used Firestone tires on vehicles other than Ford Explorers, and who therefore were not advised to underinflate their tires.

. . . .

When courts think of efficiency, they should think of market models rather than central-planning models.

Our decision in Rhone-Poulenc Rorer made this point, and it is worth reiterating: only "a decentralized process of multiple trials, involving different juries, and different standards of liability, in different jurisdictions" (51 F.3d at 1299) will yield the information needed for accurate evaluation of mass tort claims.

. . . .

No matter what one makes of the decentralized approach as an original matter, it is hard to adopt the central-planner model without violence not only to Rule 23 but also to principles of federalism.  Differences across states may be costly for courts and litigants alike, but they are a fundamental aspect of our federal republic and must not be overridden in a quest to clear the queue in court. See BMW v. Gore, 517 U.S. [559] at 568-73, [(1996)]; Szabo [v. Bridgeport Machines, Inc., 249 F.3d 672 (7th Cir. 2001)](reversing a nationwide warranty class certification); Spence v. Glock, G.m.b.H., 227 F.3d 308 (5th Cir. 2000)(reversing a nationwide tort class certification); Larry Kramer, Choice of Law in Complex Litigation, 71 N.Y.U. L. Rev. 547, 579 (1996); Linda S. Mullenix, Mass Tort Litigation and the Dilemma of Federalization, 44 DePaul L. Rev. 755, 781 (1995); Robert A. Sedler, The Complex Litigation Project's Proposal for Federally-Mandated Choice of Law in Mass Torts Cases: Another Assault on State Sovereignty, 54 La. L.Rev. 1085 (1994).  Tempting as it is to alter doctrine in order to facilitate class treatment, judges must resist so that all parties' legal rights may be respected.

In re Bridgestone/Firestone, Inc., 288 F.3d at 1018-20.

predominate over individual ones, and the Court's statements to this point have, obviously, done more to disavow various tempting but fallacious rules than they have to set forth a usable standard.

22.    There is currently a split of authority between the United States Court of Appeals over the proper way to analyze predominance -- with the Seventh and Sixth Circuits on one side and the Third, Tenth and Eleventh Circuits on the other. The Honorable Richard A. Posner,[11] United States Circuit Judge for the Seventh Circuit, concludes that the predominance inquiry boils down to "a question of efficiency." Butler v. Sears, Roebuck & Co., 702 F.3d, 359, 362 (7th Cir. 2012). Judge Posner poses the predominance question as: "Is it more efficient, in terms both of economy of judicial resources and of the expense of litigation to the parties, to decide some issues on a class basis or all issues in separate trials?" Butler v. Sears, Roebuck & Co., 702 F.3d at 362. In Butler v. Sears, Roebuck & Co., the Seventh Circuit reversed a district court's denial of certification of a class of washing-machine owners who alleged that Sears' washing machines were prone to cultivate mold and affirmed the district court's certification of the same class to pursue a claim that the machines' control units were defective. See 702 F.3d at 360-61. The Seventh Circuit certified the class -- which spanned six states -- to pursue its mold claim under state breach-of-warranty law.

---

[11]Judge Posner is not only the most widely referenced legal authority alive -- he is the most-cited legal scholar of all time. See Fred R. Shapiro, The Most-Cited Legal Scholars, 29 J. Legal Stud. 409, 424 (2000). Judge Posner has been cited more than twice as often as any other legal figure other than Ronald Dworkin:

|                          |       |
|--------------------------|-------|
| Richard A. Posner        | 7,981 |
| Ronald Dworkin           | 4,488 |
| Oliver Wendell Holmes, Jr. | 3,665 |
| John Hart Ely            | 3,032 |
| Roscoe Pound             | 3,018 |

Shapiro, supra, at 424.

23.     A class action is the more efficient procedure for determining liability and damages in a case such as this, involving a defect that may have imposed costs on tens of thousands of consumers yet not a cost to any one of them large enough to justify the expense of an individual suit.  If necessary a determination of liability could be followed by individual hearings to determine the damages sustained by each class member (probably capped at the cost of replacing a defective washing machine -- there does not seem to be a claim that the odors caused an illness that might support a claim for products liability as distinct from one for breach of warranty).   Probably the parties would agree, however, on a schedule of damages based on the cost of fixing or replacing class members' mold-contaminated washing machines.  The class action procedure would be efficient not only in cost, but also in efficacy, if we are right that the stakes in an individual case would be too small to justify the expense of suing, in which event denial of class certification would preclude any relief.

> [T]he district court will want to consider whether to create different subclasses of the control unit class for the different states.  That should depend on whether there are big enough differences among the relevant laws of those states to make it impossible to draft a single, coherent set of jury instructions should the case ever go to trial before a jury.

Butler v. Sears, Roebuck & Co., 702 F.3d at 362.  Along with numerous other class actions pending appeal before the Supreme Court, the Supreme Court vacated Butler v. Sears, Roebuck & Co., and remanded it to the Seventh Circuit "for reconsideration in light of Comcast Corp. v. Behrend."  Butler v. Sears, Roebuck & Co., 727 F.3d at 797 (7th Cir. 2013). On reconsideration, the Seventh Circuit reaffirmed its prior decision, again in an opinion that Judge Posner wrote:

> Sears thinks that predominance is determined simply by counting noses: that is, determining whether there are more common issues or more individual issues, regardless of relative importance. That's incorrect. An issue "central to the validity of each one of the claims" in a class action, if it can be resolved "in one stroke," can justify class treatment. Wal-Mart, 131 S. Ct. at 2551.  That was said in the context of Rule 23(a)(2), the rule that provides that class actions are

permissible only when there are issues common to the members of the class (as of course there are in this case).  But predominance requires a qualitative assessment too; it is not bean counting.  In Amgen Inc. v. Connecticut Retirement Plans & Trust Funds, 133 S. Ct. at 1196, the Court said that the requirement of predominance is not satisfied if "individual questions . . . overwhelm questions common to the class," and in Amchem,, 521 U.S. at 623, it said that the "predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."   And in In re Inter–Op Hip Prosthesis Liability Litigation, 204 F.R.D. 330, 345 (N.D. Ohio 2001), we read that "common issues need only predominate, not outnumber individual issues."

As we noted in Carnegie v. Household Int'l., Inc., 376 F.3d 656, 661 (7th Cir. 2004), "the more claimants there are, the more likely a class action is to yield substantial economies in litigation.  It would hardly be an improvement to have in lieu of this single class 17 million suits each seeking damages of $15 to $30 . . . .  The realistic alternative to a class action is not 17 million individual suits, but zero individual suits, as only a lunatic or a fanatic sues for $30."  The present case is less extreme: tens of thousands of class members, each seeking damages of a few hundred dollars.  But few members of such a class, considering the costs and distraction of litigation, would think so meager a prospect made suing worthwhile.

There is a single, central, common issue of liability: whether the Sears washing machine was defective.  Two separate defects are alleged, but remember that this class action is really two class actions.  In one the defect alleged involves mold, in the other the control unit.  Each defect is central to liability.  Complications arise from the design changes and from separate state warranty laws, but can be handled by the creation of subclasses.  See, e.g., Johnson v. Meriter Health Services Employee Retirement Plan, 702 F.3d [364] at 365 [(7th Cir. 2012)](10 subclasses).

Butler v. Sears, Roebuck & Co., 727 F.3d at 801-02.[12]

---

[12]  In addition to articulating the Seventh Circuit's construction of the predominance inquiry, Judge Posner addressed Comcast Corp. v. Behrend's impact on the Seventh Circuit's case:

So how does the Supreme Court's Comcast decision bear on the rulings . . . in our first decision?

Comcast holds that a damages suit cannot be certified to proceed as a class action unless the damages sought are the result of the class-wide injury that the suit alleges.  Comcast was an antitrust suit, and the Court said that "if [the plaintiffs] prevail on their claims, they would be entitled only to damages resulting from reduced overbuilder competition, since that is the only theory of antitrust impact accepted for class-action treatment by the District Court.  It follows that a model

purporting to serve as evidence of damages in this class action must measure only those damages attributable to that theory. If the model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)." "[A] methodology that identifies damages <u>that are not the result of the wrong</u> " is an impermissible basis for calculating class-wide damages. <u>Id.</u> at 1434 (emphasis added). "For all we know, cable subscribers in Gloucester County may have been overcharged because of petitioners' alleged elimination of satellite competition (<u>a theory of liability that is not capable of classwide proof</u> )." And on the next page of its opinion the Court quotes approvingly from Federal Judicial Center, Reference Manual on Scientific Evidence 432 (3d ed. 2011), that "the first step in a damages study is the translation of the legal theory of the harmful event into an analysis of the economic impact <u>of that event</u>." (emphasis the [Supreme] Court's). None of the parties had even challenged the district court's ruling that class certification required "that the damages resulting from . . . [the antitrust violation] were measurable 'on a class-wide basis' through use of a 'common methodology.'"

Unlike the situation in <u>Comcast</u>, there is no possibility in this case that damages could be attributed to acts of the defendants that are not challenged on a class-wide basis; all members of the mold class attribute their damages to mold and all members of the control-unit class to a defect in the control unit.

Sears argues that <u>Comcast</u> rejects the notion that efficiency is a proper basis for class certification, and thus rejects our statement that "predominance" of issues common to the entire class, a requirement of a damages class action under Rule 23(b)(3), "is a question of efficiency." But in support of its argument Sears cites only the statement in the dissenting opinion in Comcast that "economies of time and expense" favor class certification, -- a statement that the majority opinion does not contradict. Sears is wrong to think that anything a dissenting opinion approves of the majority must disapprove of.

Sears compares the design changes that may have affected the severity of the mold problem to the different antitrust liability theories in <u>Comcast</u>. But it was not the existence of multiple theories in that case that precluded class certification; it was the plaintiffs' failure to base all the damages they sought on the antitrust impact -- the injury -- of which the plaintiffs were complaining. In contrast, any buyer of a Kenmore washing machine who experienced a mold problem was harmed by a breach of warranty alleged in the complaint.

Furthermore and fundamentally, the district court in our case, unlike <u>Comcast</u>, neither was asked to decide nor did decide whether to determine damages on a class-wide basis. As we explained in <u>McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.</u>, 672 F.3d 482, 491-92 (7th Cir. 2012), a class action limited to determining liability on a class-wide basis, with separate hearings to determine -- if liability is established -- the damages of individual class members, or

24.     The Sixth Circuit handled essentially the same case -- a class action against Sears

for defective washing machines -- in In re Whirlpool Corp. Front–Loading Washer Products

Liability Litigation, 678 F.3d 409 (6th Cir. 2012), and also elected to certify the mold-based

claim.[13]

> [W]e have no difficulty affirming the district court's finding that common
> questions predominate over individual ones and that the class action mechanism is
> the superior method to resolve these claims fairly and efficiently. This is
> especially true since class members are not likely to file individual actions
> because the cost of litigation would dwarf any potential recovery.  See Amchem,
> 521 U.S. at 617 (finding that in drafting Rule 23(b)(3), "the Advisory Committee
> had dominantly in mind vindication of 'the rights of groups of people who
> individually would be without effective strength to bring their opponents into
> court at all'").  Further, the district court observed, any class member who wishes
> to control his or her own litigation may opt out of the class under Rule
> 23(b)(3)(A).    In re Whirlpool Corp. Front-Loading Washer Products Liability
> Litigation, 678 F.3d at 421 (citation omitted).   That case was also vacated after
> Comcast Corp. v. Behrend, and, like the Seventh Circuit, the Sixth Circuit
> reaffirmed its prior decision, fleshing out the predominance inquiry in more detail
> than it had done in its prior opinion:
>
> > Whirlpool does not point to any "fatal dissimilarity" among the
> > members of the certified class that would render the class action
> > mechanism unfair or inefficient for decision-making.   Instead,
> > Whirlpool points to "a fatal similarity -- [an alleged] failure of
> > proof as to an element of the plaintiffs' cause of action."   That
> > contention, the Supreme Court instructs, "is properly addressed at
> > trial or in a ruling on a summary-judgment motion. The allegation
> > should not be resolved in deciding whether to certify a proposed
> > class."  Tracking the Supreme Court's reasoning, we conclude here
> > that common questions predominate over any individual ones.
> > Simply put, this case comports with the "focus of the
> > predominance inquiry" -- it is "sufficiently cohesive to warrant

---

> homogeneous groups of class members, is permitted by Rule 23(c)(4) and will
> often be the sensible way to proceed.

Butler v. Sears, Roebuck & Co., 727 F.3d at 799-800 (emphasis in Butler v. Sears, Roebuck &
Co. but not Comcast Corp. v. Behrend, except as noted)(citations omitted).

[13]The Sixth Circuit's class "did not involve the other claim in [the Seventh Circuit's]
case, the control unit claim." Butler v. Sears, Roebuck & Co., 727 F.3d at 802.

adjudication by representation."

In re Whirlpool Corp. Front-Loading Washer Products Liability Litigation, 722 F.3d at 859.  The

Seventh Circuit and Sixth Circuit, thus, define predominance in much the same way: if the

district court can design a mechanism for trying the case that is fair to the defendants and more

efficient than individual litigation of the same dispute, then predominance is satisfied.   See

Butler, 727 F.3d at 802.  This styling of the predominance inquiry is in keeping with that given,

many years earlier, by a leading class-action treatise:

> [A] court addressing predominance must determine whether the evidence about
> the putative class representative's circumstances and the opposing evidence from
> the defense will enable a jury to make across-the-board "yes" or "no" factual
> determinations that fairly resolve the claims of the entire class.  Where the right to
> recover for each class member would "turn . . . on facts particular to each
> individual plaintiff," class treatment makes little sense.  If the resolution of the
> common issues devolves into an unmanageable variety of individual issues, then
> the lack of increased efficiency will prohibit certification of the class.
>
> The predominance and efficiency criteria are of course intertwined.  When there
> are predominant issues of law or fact, resolution of those issues in one proceeding
> efficiently resolves those issues with regard to all claimants in the class.  When
> there are no predominant issues of law or fact, however -- as in the instant case --
> class treatment would be either singularly inefficient, as one court attempts to
> resolve diverse claims from around the country in its own courtroom, or unjust, as
> the various factual and legal nuances of particular claims are lost in the press to
> clear the lone court's docket.

McLaughlin on Class Actions § 5:23 (11th ed.)(omission in original)(footnotes omitted).

> 25.     Although the Seventh Circuit and the Sixth Circuit may agree about the definition

of predominance, the Third, Tenth, and Eleventh Circuits stake out a different test.

> "Whether an issue predominates can only be determined after considering what
> value the resolution of the class-wide issue will have in each class member's
> underlying cause of action."  Common issues of fact and law predominate if they
> "'ha[ve] a direct impact on every class member's effort to establish liability' that
> is more substantial than the impact of individualized issues in resolving the claim
> or claims of each class member." If "after adjudication of the classwide issues,
> plaintiffs must still introduce a great deal of individualized proof or argue a
> number of individualized legal points to establish most or all of the elements of

their individual claims, [their] claims are not suitable for class certification under Rule 23(b)(3)."

Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Serv., Inc., 601 F.3d 1159, 1170

(11th Cir. 2010)(emphasis in original)(citations omitted).[14]   The Eleventh Circuit, however,

---

[14]The Eleventh Circuit first adopted this test -- relying on district court decisions -- in 2004 in Klay v. Humana, Inc., and gave renewed articulations of the test in 2009 in Vega v. T-Mobile USA, Inc., and in 2010 in Sacred Heart Health Systems, Inc. v. Humana Healthcare Services, Inc.  In each case, the Eleventh Circuit made some reference to additionally adopting a Fifth Circuit rule-of-thumb test:

> An alternate formulation of this test was offered in Alabama v. Blue Bird Body Co., 573 F.2d 309 (5th Cir. 1978).  In that case, we observed that if common issues truly predominate over individualized issues in a lawsuit, then "the addition or subtraction of any of the plaintiffs to or from the class [should not] have a substantial effect on the substance or quantity of evidence offered."   Put simply, if the addition of more plaintiffs to a class requires the presentation of significant amounts of new evidence, that strongly suggests that individual issues (made relevant only through the inclusion of these new class members) are important.  Alabama v. Blue Bird Body Co., 573 F.2d at 322 ("If such addition or subtraction of plaintiffs does affect the substance or quantity of evidence offered, then the necessary common question might not be present.").   If, on the other hand, the addition of more plaintiffs leaves the quantum of evidence introduced by the plaintiffs as a whole relatively undisturbed, then common issues are likely to predominate.

Klay v. Humana, Inc., 382 F.3d at 1255. See Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Serv., Inc., 601 F.3d at 1170 ("In practical terms, while '[i]t is not necessary that all questions of fact or law be common,' 'the addition or subtraction of any of the plaintiffs to or from the class [should not] have a substantial effect on the substance or quantity of evidence offered.'"); Vega v. T-Mobile USA, Inc., 564 F.3d 1256, 1270 (11th Cir. 2009)(quoting the above portion of Klay v. Humana, Inc.).  The Fifth Circuit, however, was not setting forth a test for when predominance is satisfied so much as a test for when an issue is common versus individualized.  The Fifth Circuit's full quote -- without the Eleventh Circuit's alterations -- is:

> We only point out that in a situation wherein one seeks to represent a nationwide class in order to obtain redress for harm done from a nationwide conspiracy consideration should be given to whether the addition or subtraction of any of the plaintiffs to or from the class will have a substantial effect on the substance or quantity of evidence offered. If such addition or subtraction of plaintiffs does affect the substance or quantity of evidence offered, then the necessary common question might not be present.

- 66 -

imposes a different, more rigorous, second step: the district court's trial plan must spend more time adjudicating the common questions than it does adjudicating the individual questions. The Eleventh Circuit's test may not be the greatest -- the Court sees little reason why negative-value cases that can be fairly and efficiently adjudicated via class action should not be certified[15] -- but

_____

State of Alabama v. Blue Bird Body Co., Inc., 573 F.2d at 322 (footnote omitted).

[15]In fairness to the Eleventh Circuit, Judge Posner's test merges the predominance and superiority inquiries -- effectively reading out predominance -- in negative-value cases. Thus, the Eleventh Circuit's test is truer to rule 23's text than Judge Posner's. "Predominate," the word that rule 23 uses, means "[t]o be of greater power, importance, or quantity; be most important or outstanding." The American Heritage Dictionary of the English Language 1032 (William Morris ed., New College ed. 1976)(emphasis added). Rule 23's text thus arguably suggests a direct comparison of common and individual issues, and not -- as Judge Posner suggests -- an indirect comparison that decides the predominance question on the basis of a fancy economic analysis. There are, however, two other rule 23 provisions whose impact on predominance is not often discussed: (i) the issue class-action clause, see Fed. R. Civ. P. 23(c)(4) ("When appropriate, an action may be brought or maintained as a class action with respect to particular issues."); and (ii) the subclassification clause, see Fed. R. Civ. P. 23(c)(5)("When appropriate, a class may be divided into subclasses that are each treated as a class under this rule."). These provisions are indeed unfortunate for those who wish to read rule 23 as containing the seeds of its own destruction. Rule 23(c)(4) allows for adjudication of common issues, even if these issues do not add up to a common claim. Rule 23(c)(5) allows for collective adjudication, even if it falls short of being completely "classwide" adjudication. Judge Posner's test explicitly admits of subclasses and issue classes. Even if it had not, their impact in Judge Posner's analysis would be obvious: the district court uses the tools of subclassification and issue classification -- along with other management tools, such as polyfurcation -- to design a class-action management plan, and then decide whether the plan is more or less efficient than separate trials.

   The impact that these provisions have on the Eleventh Circuit's approach is less clear. The Eleventh Circuit's best discussion of subclasses comes from Sacred Heart Health Systems, Inc. v. Humana Military Healthcare Services, Inc.:

      [W]e cannot accept the district court's proposal to use subclasses corresponding to the hospitals' six categories of payment clauses. We recognize the long and venerated practice of creating subclasses as a device to manage complex class actions, but the six subclasses proposed here mask a staggering contractual variety. The sixth proposed subclass -- a miscellaneous residue of numerous payment clauses that are insusceptible of ready classification -- alone is fatal to predominance. When this "potpourri" subclass, as Humana has termed it, is broken down into its disparate component parts, the illusion of uniformity gives

way to nearly thirty subclasses.

Common sense tells us that "[t]he necessity of a large number of subclasses may indicate that common questions do not predominate," Manual for Complex Litigation § 21.23 (4th ed. 2004); see also Harding v. Tambrands Inc., 165 F.R.D. 623, 630 (D. Kan. 1996)("The potential for numerous different subclasses weighs against a finding of predominance of common issues."). Here, the necessary recourse to a "miscellaneous" subclass readily indicates the lack of a predominant question.

Ultimately, after examining the many individualized payment clauses contained in the network agreements, we perceive a "distinct possibility that there was a breach of contract with some class members, but not with other class members." Subclasses are no answer to this problem, meaning that the efficiency of a class action will be lost entirely unless the hospitals are allowed "to stitch together the strongest contract case based on language from various [contracts], with no necessary connection to their own contract rights." The hospitals, however, may not lawfully "amalgamate" their disparate claims in the name of convenience. The Rules Enabling Act, 28 U.S.C. § 2072 -- and due process -- prevents the use of class actions from abridging the substantive rights of any party. Yet, from the record before us, an abridgment of the defendant's rights seems the most likely result of class treatment. By glossing over the striking differences in the material terms of the agreements, the district court created an "unnecessarily high risk," of such unlawful results, and thereby abused its discretion.

Sacred Heart Health Systems, Inc. v. Humana Military Healthcare Services, Inc., 601 F.3d at 1176 (citations omitted). These statements imply that, but for the sixth "category" of payment clauses -- really a catchall for all contracts that did not fit into any of the five real categories -- the class would be certifiable. The only "abridgement of the defendant's rights" that the district court's plan would produce would be the "'amalgamat[ion]'" of different contractual language into a single category -- the sixth category. 601 F.3d at 1176. That case, thus, leaves open the question whether subclassification and issue certification can aid in satisfying predominance, or if these techniques are separate from the predominance inquiry.

The Fifth Circuit staked out a clear answer to this question in its much-discussed Castano v. American Tobacco Co. case, deciding the issue in a way one might expect:

Severing the defendants' conduct from reliance under rule 23(c)(4) does not save the class action. A district court cannot manufacture predominance through the nimble use of subdivision (c)(4). The proper interpretation of the interaction

>between subdivisions (b)(3) and (c)(4) is that a cause of action, as a whole, must satisfy the predominance requirement of (b)(3) and that (c)(4) is a housekeeping rule that allows courts to sever the common issues for a class trial.  Reading rule 23(c)(4) as allowing a court to sever issues until the remaining common issue predominates over the remaining individual issues would eviscerate the predominance requirement of rule 23(b)(3); the result would be automatic certification in every case where there is a common issue, a result that could not have been intended.

84 F.3d at 745 n.21 (citations omitted).  This logic is hardly unassailable.  Namely, the result of reading rules 23(c)(4) and (c)(5) as bearing on the predominance inquiry would not be "automatic certification in every case where there is a common issue," because superiority must still be satisfied. 84 F.3d at 745 n. 21.  If a proposed class action is superior -- e.g., if it lacks the value to be brought on an individual basis -- and individual issues can be pared away via rules 23(c)(4) and (c)(5) then it is not clear why certification "could not have been intended" by the rule.  84 F.3d at 745 n.21.  Moreover, it is a poor reading of the rule's text.  Presumably, even if rules 23(c)(4) and (c)(5) are mere "housekeeping rule[s]," they would still alleviate "likely difficulties in managing a class action." 84 F.3d at 745 n.21; Fed. R. Civ. P. 23(b)(3)(D). Because rule 23 directs that "[t]he matters pertinent to these findings [predominance and superiority] include: ... the likely difficulties in managing a class action," the Court, if it were writing on a clear slate would think that rules 23(c)(4) and (c)(5) would play a part in the predominance determination, Fed. R. Civ. P. 23(b)(3), and that this result thus "could not have been intended."  84 F.3d at 745 n. 21.

The Fifth Circuit's approach attracted the adherence of a revered jurist on the Fourth Circuit -- although not the Fourth Circuit itself.  The Honorable Paul V. Niemeyer, United States Circuit Judge for the Fourth Circuit, endorsed the Fifth Circuit's view in an opinion concurring in part and dissenting in part from an opinion in which the Fourth Circuit adopted the opposing view:

>Despite the overwhelming predominance of these individualized issues and claims over the common issue that the majority now certifies for class treatment, the majority has adopted an inventive approach to Rule 23 that allows certification of a class where the predominance requirement of Rule 23(b)(3) is admittedly unmet in the context of the case as a whole.  According to the majority, to require the certified issue in this case to predominate over the individualized issues in the action as a whole ignores Rule 23(c)(4)(A), which it appears to view as a fourth avenue for class certification, on equal footing with Rules 23(b)(1), 23(b)(2), and 23(b)(3).  In doing so, the majority glorifies Rule 23(c)(4)(A) -- a housekeeping rule that authorizes a court to certify for class treatment "particular issues" in a case that otherwise satisfies Rule 23(a) and 23(b) -- with the effect of materially rewriting Rule 23 such that Rule 23(b)(3)'s requirements no longer need be applied to "[a]n action," see Fed. R. Civ. P. 23(b), but rather to any single issue, no matter how small.

Not only does the majority's approach expand Rule 23 beyond its intended reach, but it also

creates a direct conflict with the Fifth Circuit which has held:

> A district court cannot manufacture predominance through the nimble use of subdivision (c)(4). The proper interpretation of the interaction between subdivisions (b)(3) and (c)(4) is that a cause of action, as a whole, must satisfy the predominance requirement of (b)(3) in that (c)(4) is a housekeeping rule that allows courts to sever the common issues for a class trial.

Castano v. American Tobacco Co., 84 F.3d 734, 745 n.21 (5th Cir. 1996). Despite Judge Niemeyer's concern with creating a Circuit split, the Second Circuit, the Ninth Circuit, and, of course, the Seventh Circuit have all held that subclasses can be used to satisfy predominance concerns since at least 2001, two years before Gunnells v. Healthplan Services, Inc. See Zinser v. Accufix Research Inst., Inc., 253 F.3d at 1189-90, 1192, n. 8. See Robinson v. Metro-North Commuter R.R., 267 F.3d 147, 167-69 (2d Cir. 2001); Jefferson v. Ingersoll Int'l Inc., 195 F.3d 894, 898 (7th Cir. 1999).

The Eleventh Circuit has refrained from taking a side on this question:

> Some have been critical of the piecemeal certification of class action status for claims within a case. See Gunnells v. Healthplan Servs., Inc., 348 F.3d 417, 446-47 (4th Cir. 2003)(Niemeyer, J., dissenting)(arguing that the predominance requirement in Fed. R. Civ. P. 23(b) applies to the action as a whole, not to individual subclasses or claims); Castano v. Am. Tobacco Co., 84 F.3d 734, 745 n. 21 (5th Cir. 1996)("The proper interpretation of the interaction between [Fed. R. Civ. P. 23] subdivisions (b)(3) and (c)(4) is that a cause of action, as a whole, must satisfy the predominance requirement of (b)(3) and that (c)(4) is a housekeeping rule that allows courts to sever the common issues for a class trial."). We did not directly address the propriety of such partial certification in Klay.

Borrero v. United Healthcare of N.Y., Inc., 610 F.3d 1296, 1310 n. 5 (11th Cir. 2010)(alterations in original). The Tenth Circuit also appears to have refrained from taking a side:

> Plaintiffs urge us to consider a "hybrid" certification whereby the liability stage might be certified for class treatment under Rule 23(b)(2) even if the damages stage does not qualify for such treatment. See Robinson v. Metro-North Commuter R.R., 267 F.3d 147, 167-69 (2nd Cir. 2001). Compare Lemon v. Int'l Union of Operating Engr's, Local No. 139, AFL-CIO, 216 F.3d 577, 581 (7th Cir. 2000), and Jefferson v. Ingersoll Int'l Inc., 195 F.3d 894, 898 (7th Cir. 1999), with Allison v. Citgo Petroleum Corp., 151 F.3d 402, 420-22 (5th Cir. 1998). We do not need to rule on a hybrid possibility because in the instant case, the liability stage does not satisfy either Rules 23(b)(2) or 23(b)(3). The district court's ruling that plaintiffs did not allege a sufficient policy, practice or pattern of discrimination to warrant class treatment for liability determination is not an abuse of discretion.

it is commendable in that it is a test that district courts can use, rather than yet another meaningless recitation, see CGC Holding Co. LLC v. Broad & Cassel, 773 F.3d 1076 (10th Cir. 2014)("[T]he predominance prong 'asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation defeating, individual issues.'" (quoting Newberg § 4:49)), circular axiom, see, e.g., Amchem Prods., Inc., 521 U.S. at 623 ("The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."), obvious guidepost, see Reed v. Bowen, 849 F.2d at 1309 ("Each case must be decided on its own facts, on the basis of 'practicalities and prudential considerations.'"), self-evident comparison, see Monreal v. Potter, 367 F.3d at 1237 ("[T]he predominance criterion of Rule 23(b)(3) [i]s 'far more demanding' tha[n] the Rule 23(a) commonality requirement[.]" (quoting Amchem Prods., Inc., 521 U.S. at 623–24)), or worthless slogan, see Marcus v. BMW of N. Am., LLC, 687 F.3d at 600 (exhorting district courts to examine claims " 'through the prism' of Rule 23(b)(3)").

### b.   The Superiority Requirement.

26.     The second requirement for certifying a(b)(3) class is superiority, which means that a class action would be superior to -- not merely just as good as or more convenient than -- all other available procedural mechanisms, including: (i) individual actions by class members; (ii) ordinary joinder rules, see Fed. R. Civ. P. 18-20; (iii) multidistrict litigation, see 28 U.S.C. § 1407; (iv) multiparty multiforum litigation, see 28 U.S.C. § 1369; and (v) the use of bellwether cases. The superiority requirement thus sets a high bar, but there are two ways that a proposed class can get an immediate leg up on certification, both of which involve rendering the aforementioned procedural devices impractical for the task at hand.

---

Monreal v. Potter, 367 F.3d at 1237 n.12 (Ebel, J.).

27.     First, the suit can consist of so-called negative value claims -- claims in which the cost of litigation exceeds the likely recovery, rendering them economically non-viable without aggregation. These claims are the heart and soul of the class action, as the Supreme Court recently reaffirmed:

> The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights. A class action solves this problem by aggregating the relatively paltry potential recoveries into something worth someone's (usually an attorney's) labor.

Amchem Prods., Inc., 521 U.S. at 617 (quoting Mace v. Van Ru Credit Corp., 109 F.3d 338, 344 (7th Cir. 1997)).   The class action absolves absent plaintiffs of the otherwise prohibitive obligations of having to hire their own attorneys, devote time and energy to their own discovery, and potentially testify on their own behalf.

28.     Second, the class may consist of such a large volume of similar cases that the judiciary would be overwhelmed if it had to treat each separately.   While this consideration militates against individual treatment and counsels towards aggregation, the court must carefully consider whether another mass-aggregation form -- such as multidistrict litigation -- might be better suited to the task.

29.     In addressing whether a proposed class action is superior to other available methods of adjudicating the controversy, courts start with the four factors that rule 23(b)(3)(A)-(D) enumerates, although those factors are not exhaustive.   See Fed. R. Civ. P. 23 advisory committee's notes ("Factors (A)-(D) are listed, non-exhaustively, as pertinent to the findings."); Amchem Prods., Inc., 521 U.S. at 615-16 ("Rule 23(b)(3) includes a nonexhaustive list of factors pertinent to a court's 'close look' at the predominance and superiority criteria.").   The first factor, "the class members' interests in individually controlling the prosecution . . . of separate

- 72 -

actions," closely tracks the money value of the individual cases. Fed. R. Civ. P. 23(b)(3)(A). When individual actions are practical, they are preferred; the United States has a "deep-rooted historic tradition that everyone should have his own day in court" and adjudicating individual disputes is the core activity of the nation's judicial scheme. Martin v. Wilks, 490 U.S. 755, 762 (1989)(quoting 18C Charles Alan Wright, Arthur R. Miller, Edward H. Cooper, Vikram David Amar, Richard D. Freer, Helen Hershkoff, Joan E. Steinman, Catherine T. Struve, Federal Practice Procedure, Jurisdiction & Related Matters § 4449, at 417 (1981)).  The proposed class members' emotional connection to the case may also be relevant: the stronger the attachment, the more reticent the court should be to certify the case.  See Vassalle v. Midland Funding, LLC, 708 F.3d 747, 758 (6th Cir. 2013); Abby v. City of Detroit, 218 F.R.D. 544, 549-50 (E.D. Mich. 2003).  Another recurring issue that arises in relation to this factor is when the statute invoked provides greater remedies for individual suits than for class suits, either by imposing a damage cap for class actions which does not apply to individual actions or by granting statutory damages to individual plaintiffs while requiring class plaintiffs to prove actual damages. See, e.g., Fair Debt Collection Practices Act, 15 U.S.C. § 1692k(2)(B) (capping individual damages at $1,000 and class action damages at $500,000); Truth in Lending Act, 15 U.S.C. § 1640(a) (capping individual damages at $5,000 and class action damages at $500,000).  Although claims under these statutes may be more lucratively brought as individual actions, courts should assess the real-world likelihood that class members would bring their own actions, which implicates another factor the court should consider: the likelihood that proposed class members know they have a claim and whether they are savvy enough to pursue it.[16]  See Hicks v. Client Servs., Inc.,

---

[16]It is often the case that a plaintiff would receive greater remuneration -- damages or settlement less attorneys' fees and other expenses of litigation -- from an individual action than he would from his or her proportional share of the class recovery.  If the number of proposed

257 F.R.D. 699, 701 (S.D. Fla. 2009)(Dimitrouleas, J.)(finding superiority, because "class

members [most likely do not] understand the provisions well enough to know that it may be

financially worthwhile to spend the time and effort to litigate these matters").  As the Honorable

Loretta A. Preska, Chief United States District Judge for the Southern District of New York,

wrote:

> [W]hile the potential for higher individual recoveries exists, realizing that
> potential requires assuming that each putative class member is aware of her rights,
> willing to subject herself to all the burdens of suing and able to find an attorney
> willing to take her case.  Those transaction costs are not insubstantial and have
> prompted other courts in this Circuit to conclude that litigating as a class is
> superior.  Kalish v. Karp & Kalamotousakis, LLP, 246 F.R.D. 461, 464 (S.D.N.Y.
> 2007).  See Jancik v. Cavalry Portfolio Servs., LLC, No. CIV 06–3104 MJD/AJB,
> 2007 WL 1994026, at *11 (D. Minn. July 3, 2007)("[T]he truth is that the putative
> plaintiffs in this case are not likely to know their rights and are therefore not
> likely to pursue these claims on their own.").

30.     The second enumerated (b)(3) factor, "the extent and nature of any litigation

concerning the controversy already begun by . . . class members," is closely linked to the first

factor. Fed. R. Civ. P. 23(b)(3)(B).  The advisory notes to the rules state that "[t]he court is to

consider the interests of individual members of the class in controlling their own litigations and

carrying them on as they see fit.  In this connection the court should inform itself of any

litigation actually pending by or against the individuals."   Fed. R. Civ. P. 23 advisory

committee's notes (citations omitted).  This passage suggests that the extent to which proposed

class members -- or individuals who would otherwise be proposed class members but for being

specifically excluded from the definition by virtue of their individual claims -- have already filed

---

class members likely to file individual claims ($n$), multiplied by the likely remuneration each
would receive from an individual action ($i$), exceeds the entire class' recovery less attorneys'
fees and expenses ($c$), then the Court will be hesitant to find superiority. Thus, if $n \bullet i > c$, the
Court will not generally certify a(b)(3) class. The Court should bear in mind, however, that $n$
includes only those individuals who: (i) would, in the event of certification, become class
members, i.e., they would not opt out; and (ii) would, nonetheless, in the event the class was not
certified, file an individual action.  Thus, $n$ is likely to be a small number in most cases.

individual claims is probative evidence of the extent to which they will continue to file individual claims in the event of certification denial, and indicates a higher "interest[] in individually controlling the prosecution."  Fed. R. Civ. P. 23(b)(3)(A).  It is also probative evidence whether the claims are truly negative value or whether the plaintiffs' counsel is merely representing that they are to enhance his argument for certification.

31.    In evaluating the (b)(3)(A) and (b)(3)(B) factors, the court must keep in mind a powerful fact that counsels strongly in favor of finding superiority: (b)(3) class actions give all proposed class members the opportunity to opt out of inclusion in the class.  See Fed. R. Civ. P. 23(c)(2)(B). The individual actions that rule 23(b)(3)(B) directs the court to consider would not be swept under the class action's umbrella, nor would certification interfere with the litigation autonomy of any proposed class member who plans to file an individual claim but has yet to do so.  The sole group that rule 23(b)(3)(A) and (b)(3)(B) protects consists only of those individuals who (i) have not yet filed an individual action, (ii) but are identifiable by proposed class counsel as having a claim, (iii) who are sent notice of their claim, (iv) who still, upon receiving notice, fail to meet with an attorney to file an individual claim or even to opt out of the class, and (v) only later develop an interest in pursuing an individual claim, and find themselves unable to do so because of the res judicata effect that a class action has on its members.  As a practical matter, in most instances, this group contains few people, if any.  Individuals interested in litigating their claims individually will most likely have already filed suit; at the very latest, receipt of the class notice will spur them into action, and they will opt out of the class.  For this reason, the Court concludes that concerns about (b)(3) class actions' intrusions into litigant autonomy are overblown and even somewhat paternalistic.

32.    The Court does not write off the rule 23(b)(3)(B) factor entirely, however, as it

provides one piece of useful, specific guidance.  The rule speaks not only of assessing the "extent . . . of any litigation . . . already begun" -- presumably meaning the raw number of cases filed relative to the size of the proposed class -- but also of the "nature of any litigation . . . already begun."  Fed. R. Civ. P. 23(b)(3)(B).  The Court interprets this language to mean that it must look at what procedural forms the already-filed cases have taken.  For example, if a group of asbestos plaintiffs file for class certification, the court should decline to certify on the ground that asbestos cases are consolidated in multidistrict litigation in the United States District Court for the Eastern District of Pennsylvania.  See In re Asbestos Prods. Liability Litig. (No. VI), MDL No. 875 (E.D. Penn.)(Robreno, J.).  Furthermore, the Court concludes that, if a class has already been certified to pursue certain claims, redundant classes should generally not be certified.  See Newberg § 4:70 ("[I]f a *class action* case is already pending, certification of another class suit might not be sensible or superior to the current litigation posture." (emphasis in original)).  Subsequent proposed classes should either be defined to avoid class member-overlap with previously certified classes or else should assert different claims.[17]

33.     The third rule 23(b)(3) factor is "the desirability or undesirability of concentrating the litigation of the claims in the particular forum," which can be split into two prongs: (i) whether aggregation is desirable; and (ii) whether the particular court at issue is a desirable forum to adjudicate the aggregated dispute. Fed. R. Civ. P. 23(b)(3)(C). The first prong, whether aggregation is desirable, is considered a recitation of the general superiority inquiry; all of the

---

[17]If a class has already been certified relating to a matter, and a new plaintiff seeks both (i) certification of a larger class than was previously certified; and (ii) to assert claims for which the previous class was not certified, then the new plaintiff could avoid overlap between the new and old class actions by splitting the new class into different classes or subclasses.  The claims contained in the already-certified class action could be asserted in the proposed class action only by individuals excluded from the already-certified class' definition.  Claims not included in the already-certified class action could be asserted by the entirety of the proposed class, including those individuals who are also members of the already-certified class.

aforementioned factors and considerations apply, and courts should, additionally, consider the interest of judicial economy -- from this perspective, the more cases that can be aggregated, the better.  See Newberg § 4:71.  The second prong is whether the particular court at issue is a desirable forum for the litigation.  Some issues that reliably influence the determination of this prong include: (i) the geographic convenience of the parties, witnesses, or class counsel, see Zinser v. Accufix Research Inst., Inc., 253 F.3d 1180, 1191-92 (9th Cir. 2001); (ii) the locus of the harm, as well as any other events forming the basis of the action, see Winkler v. DTE, Inc., 205 F.R.D. 235, 245 (D. Ariz. 2001); (iii) the location of the bulk of the proposed class, see Macarz v. Transworld Sys., Inc., 193 F.R.D. 46, 57 (D. Conn. 2000); and (iv) whether the defendant is located in the forum state, see In re Warfarin Sodium Antitrust Litig., 391 F.3d 516, 534 (3rd Cir. 2004).  "The particular court at issue" does not refer only to the desirability of the United States District Court for the District of New Mexico, or even of the Albuquerque division, but, rather, the prong's inquiry extends all the way down to the level of the individual district judge.  For example, if a district judge has already made several pre-certification preliminary rulings, see Klay v. Humana, Inc., 382 F.3d 1241, 1271 (11th Cir. 2004); if he or she has other, similar actions consolidated in his court, see Beaulieu v. EQ Indus. Servs., Inc., No. 5:06–CV–00400–BR, 2009 WL 2208131, at *23 (E.D.N.C. July 22, 2009)(Britt, J.); In re Relafen Antitrust Litig., 218 F.R.D. 337, 347 (D. Mass. 2003)(Young, J.); or even if he or she possesses particular expertise at handling the claims alleged by the proposed class, the judge may weigh those facts in favor of a finding of superiority.

34.    The fourth, final, and most important[18] factor a court must consider in assessing

---

[18]Newberg writes that the "manageability factor . . . is, by far, the most critical concern in determining whether a class action is a superior means of adjudication. Indeed, the superiority discussion has, to this point, been playing *Hamlet* without the prince, and now, it is time to usher

superiority is the extent to which the court will be able to manage the class action, if certified, through pre-trial litigation and trial, accurately adjudicating the class' claims -- in particular the individual issues -- and fairly distributing relief among the class members.  See Fed. R. Civ. P. 23(b)(3)(D).  The manageability factor "encompasses the whole range of practical problems that may render the class action format inappropriate for a particular suit."  Eisen v. Carlisle & Jacquelin, 417 U.S. at 164.   The principal concern in a manageability inquiry is individualization. The proposed class size, on its own, does not affect manageability; increasing the size of a proposed class only hurts manageability if it introduces new proposed class members with individual issues.  See Carnegie v. Household Int'l, Inc., 376 F.3d 656, 660-61 (7th Cir. 2004)(Posner, J.).  Accordingly, several courts have held that, if the predominance requirement is met, then the court should not decline to certify the class on manageability grounds alone.

> The predominance analysis has a tremendous impact on the superiority analysis for the simple reason that, the more common issues predominate over individual issues, the more desirable a class action lawsuit will be as a vehicle for adjudicating the plaintiffs' claims both relative to other forms of litigation such as joinder or consolidation, and in absolute terms of manageability.  Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Servs., Inc., 601 F.3d at 1184 (internal citations and quotation marks omitted).  See Klay v. Humana, Inc., 382 F.3d at 1272 ("[W]here a court has already made a finding that common issues predominate over individualized issues, we would be hard pressed to conclude that a class action is less manageable than individual actions.").

35.     When it comes to designing a fair management plan for trying a class action, district courts have myriad tools which can be customized to suit the needs of individual cases: "[W]hen a judge becomes convinced that a case is 'complex,' procedural innovation often replaces procedural conservatism." Jay Tidmarsh & Roger H. Trangsrud, Modern Complex Litigation 34 (2d ed. 2010).  Most techniques that are truly "procedural" are fair game: cases can

---

the prince onstage."  Newberg § 4:72.

be bifurcated,[19] trifurcated, or polyfurcated; trials can be conducted in multiple stages or phases; and, provided that each defendant's overall monetary liability can be ascertained, the sometimes difficult question of how to distribute said damages among the class can be addressed with less formality.

36.     Techniques that merely presume away substantive elements that a plaintiff normally has to prove, or that would impair a defendant's due-process rights, however, are impermissible.  In particular, the Supreme Court has expressly disavowed "trials by statistics" or "trials by formula," either as to liability or damages.  Wal-Mart v Dukes, 564 U.S. at 361.  A trial by statistics involves a small but representative sample of class members presenting evidence on individual questions in their own cases and then inviting the jury to extrapolate its conclusions from the sample to the entire class.  See, e.g., Wal-Mart v Dukes, 564 U.S. at 361.  For example, counsel for a class of 5,000 might present fifty class members' cases in the same way he would if he or she were trying them individually.  Counsel would additionally present expert testimony that those fifty class members were representative of the class -- generally meaning that they were selected at random -- and that both (i) the proportion of the sample to which the defendant is liable, and (ii) the damage inflicted on the average individual in the sample, could be

---

[19]"Vertical" polyfurcation, which is what is typically meant when bifurcation is discussed, is so named because the separately tried elements build on top of each other, and a negative verdict in one trial obviates the need for the second trial.  For example, if the jury comes back for the defendant on a liability-only trial, then there is no need for a trial on damages. Vertical polyfurcation also often requires that the separate trials be performed in a certain sequence. "Horizontal" polyfurcation is so named because the trials do not build on one another, but rather sit analytically side-by-side. "Severance" is similar to the criminal procedural maneuver in which a defendant whose case is joined to be tried with another defendant's or defendants' petitions the court for his or her own separate trial. Fed. R. Crim. P. 14(a), 12(b)(3)(D).

generalized to the entire class to a certain confidence interval and level.[20]

37.     The defendants might put on their own sample, attack the representativeness of the plaintiffs' sample, or put on non-randomly selected class members whose cases were weak; they would almost certainly also present evidence defending against the individual cases of the plaintiffs' sample.   The jury, if it bought into the plaintiff's theory, might decide that the defendant was liable to twenty members of the sample for a total of $100,000.00, extrapolate from the sample to the entire class, and award the class ten million dollars in damages.

38.     The Supreme Court bars this method of trying cases, because it violates the defendant's right to have each element of each claim asserted against it by each class member specifically proven.   See Wal-Mart v Dukes, 564 U.S. at 361.[21]   When issues are truly common, multiple class members' claims -- or at least elements thereof -- can be specifically proven in one

---

[20]A confidence interval for a proportion estimate is also known as a "margin of error."  It is the "plus or minus" figure often displayed next to the proportion estimate in, e.g., public polling data.  See, e.g., Confidence Intervals,   Yale University Department of Statistics, http://www. stat.yale.edu/Courses/1997-98/101/confint.htm; Confidence Interval, Wikipedia, http://en.wikipedia.org/wiki/Confidence_interval; Margin of Error, Wikipedia, http://en.wikipedia.org/wiki/Margin_of_error (collectively, "CI/CL Websites").  A confidence level is the percent certainty that the actual proportion fall within the margin of error of the stated estimate.  See CI/CL Websites.  For example, if Gallup, Inc. says that 39% of Americans -- with a confidence interval of +/- 3% and a confidence level of 95% -- approve of President Barack H. Obama's job performance, then there is less than a 5% chance that the actual percentage of Americans who approve of President Obama's performance falls outside of the 36% to 42% range.

Even with the same sampling data, a confidence interval can be improved at the expense of confidence level and vice versa.  See CI/CL Websites.  For example, Gallup, Inc. might be able -- and the Court has not conducted the actual calculations -- to display the same data as having a +/- 8% margin of error and a 99% confidence level, or a +/- 1% margin of error and a 90% confidence level.  The use of a 95% confidence level, however, is a scientific and industry standard.

[21]The Supreme Court based its holding -- or, more precisely, its dicta -- disclaiming trials by formula on the Rules Enabling Act, 28 U.S.C. § 2072(b), stating that trials by statistics effectively alter the substance of the law being applied, but there additionally may be Due Process concerns under the Fifth Amendment to the Constitution of the United States. See Wal-Mart v Dukes, 564 U.S. at 361 (citing Ortiz v. Fibreboard Corp., 527 U.S. 815, 845, (1999)).

fell swoop; that this common determination can be done forms the basis of the class action.

Truly individual issues, on the other hand, must be adjudicated individually and not by statistical

inference.[22]

     39.    In formulating a workable trial plan, the Court must also ensure that it does not

run afoul of the Seventh Amendment. The Seventh Amendment contains two clauses:

     In Suits at common law, where the value in controversy shall exceed twenty

---

[22]While the Court fully agrees with Justice Scalia that courts cannot sacrifice the defendant's rights for the economic convenience of the plaintiffs, the Court is not convinced that it, as Wal-Mart v. Dukes seems to suggest, should forego the advantages of class certification merely to convenience the defendant in carrying burdens which the defendant would have to carry even if the litigation was conducted individually.  If the defendant ordinarily bears the burden to produce certain evidence or prove certain allegations, that burden might be exceptionally inconvenient for it do so on an individual basis against an enormous number of class members should not, in the Court's opinion, weigh against class certification.  For example, if a defendant is sued in a breach-of-contract class action in which 1,000 class members allege that the defendant was not properly performing a term in an identical form contract executed between the defendant and every class member, the defendant might wish to introduce individualized parol evidence -- such as oral communications contemporaneous with the signing of the written instrument explaining the disputed term -- or inject individual issues into the case by asserting affirmative defenses -- such as that certain class members waived performance of the disputed term.  In the Court's opinion -- not necessarily the Supreme Court's -- the defendant would be free to pursue these strategies, but, just as it would in 1,000 individual suits, it must discover and present proof against each individual class member to whom these theories apply. In the Court's view, just as plaintiffs cannot conduct trials by statistics, the defendant could not put one-hundred class members on the stand to testify to waiver and then expect anything more than a ten-percent decrease in class damages as a result.  Although this burden may seem unfair to the defendant, the defendant would have to expend the same energy and resources in the 1,000 suits were brought individually.  That such suits might never be brought -- because they would not be economically viable for the plaintiffs or because the plaintiffs are not aware of their claims -- should not, in the Court's view, excuse the defendant of its ordinary litigation burdens. In short, the issues that should most cut against a finding of predominance are those individual questions that would ordinarily be the plaintiff's burden to answer at trial: elements of the prima facie case and individualized rebuttals of any common affirmative defenses that the defendant asserts.  The Court must, however, faithfully and fully apply Supreme Court and Tenth Circuit law.  The Court concludes that Comcast Corp. v. Behrend and Wal-Mart v. Dukes require the Court to count time spent adjudicating individual affirmative defenses against the predominance finding.

dollars, [(i)] the right of trial by jury shall be preserved, and [(ii)] no fact tried by a jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law.

U.S. Const. amend. VII.

40.     These clauses are known as the trial-by-jury clause and the reexamination clause, respectively, and bifurcation has been challenged under both.  Plaintiffs often dislike bifurcation, because it lowers their odds of success by excluding damages evidence from the liability phase -- evidence of the plaintiff's injuries that is often evocative -- and necessitating that they win two trials instead of one.  They have, accordingly, argued that bifurcation -- a procedural innovation which post-dates the Founding -- violates the trial-by-jury clause. Whatever the merits of this argument, the Supreme Court has rejected it:

> [W]e are not now concerned with the form of the ancient rule. It is the Constitution which we are to interpret; and the Constitution is concerned, not with form, but with substance.  All of vital significance in trial by jury is that issues of fact be submitted for determination with such instructions and guidance by the court as will afford opportunity for that consideration by the jury which was secured by the rules governing trials at common law.  Beyond this, the Seventh Amendment does not exact the retention of old forms of procedure.  It does not prohibit the introduction of new methods for ascertaining what facts are in issue . . . .

Gas. Prods. Co. v. Champlin Refining Co., 283 U.S. 494, 498 (1931).  The only restriction that the trial-by-jury clause places on trial-separation schemes is that, when a case contains both legal and equitable issues -- the former of which must be submitted to a jury and the latter of which a judge can decide -- the judge may not rule on the equitable issues before trial in such a way as to preclude the jury from trying the legal issues.  See Beacon Theatres, Inc. v. Westover, 359 U.S. 500, 510-11 (1959).

> The court should take care when deciding which issues may and should be severed for separate trial and the order in which to try them[, as] the right to trial by jury on legal claims may not (except under "the most imperative circumstances") be lost by a prior determination of equitable claims.

Manual for Complex Litigation § 11.632, at 122.

41.     The reexamination clause presents more formidable difficulties to polyfurcation.

Relatively few appellate judges have invalidated lower-court judgments or class-management plans on this ground, by far the most famous being Judge Posner:

> [T]he district judge . . . exceeded his authority [at] the point at which his plan of action proposes to divide the trial of the issues that he has certified for class-action treatment from the other issues involved in the thousands of actual and potential claims of the representatives and members of the class.  Bifurcation and even finer divisions of lawsuits into separate trials are authorized in federal district courts.  And a decision to employ the procedure is reviewed deferentially.  However, as we have been at pains to stress recently, the district judge must carve at the joint.  Of particular relevance here, the judge must not divide issues between separate trials in such a way that the same issue is reexamined by different juries.  The problem is not inherent in bifurcation.  It does not arise when the same jury is to try the successive phases of the litigation.  But most of the separate "cases" that compose this class action will be tried, after the initial trial in the Northern District of Illinois, in different courts, scattered throughout the country.  The right to a jury trial in federal civil cases, conferred by the Seventh Amendment, is a right to have juriable issues determined by the first jury impaneled to hear them (provided there are no errors warranting a new trial), and not reexamined by another finder of fact. This would be obvious if the second finder of fact were a judge.  But it is equally true if it is another jury.  In this limited sense, a jury verdict can have collateral estoppel effect.

> The plan of the district judge in this case is inconsistent with the principle that the findings of one jury are not to be reexamined by a second, or third, or *n*th jury.  The first jury will not determine liability.  It will determine merely whether one or more of the defendants was negligent under one of the two theories.  The first jury may go on to decide the additional issues with regard to the named plaintiffs.  But it will not decide them with regard to the other class members.  Unless the defendants settle, a second (and third, and fourth, and hundredth, and conceivably thousandth) jury will have to decide, in individual follow-on litigation by class members not named as plaintiffs in the Wadleigh [v. Rhone-Poulenc Rorer Inc., 157 F.R.D. 410 (N.D. Ill. 1994)] case, such issues as comparative negligence -- did any class members knowingly continue to use unsafe blood solids after they learned or should have learned of the risk of contamination with HIV? -- and proximate causation.  Both issues overlap the issue of the defendants' negligence.  Comparative negligence entails, as the name implies, a comparison of the degree of negligence of plaintiff and defendant.  Proximate causation is found by determining whether the harm to the plaintiff followed in some sense naturally, uninterruptedly, and with reasonable probability from the negligent act of the defendant.  It overlaps the issue of the defendants' negligence even when the state's law does not (as many states do) make the foreseeability of the risk to which the defendant subjected the plaintiff an explicit ingredient of negligence.  A second or subsequent jury might find that the defendants' failure to take precautions against infection with Hepatitis B could not be thought the proximate

cause of the plaintiffs' infection with HIV, a different and unknown blood-borne virus. How the resulting inconsistency between juries could be prevented escapes us.

In re Rhone-Poulenc Rorer, Inc., 51 F.3d at 1302–03 (citations omitted).

42.     By and large, other courts have not picked up and run with Judge Posner's Seventh Amendment concerns with polyfurcation.  The Tenth Circuit has not addressed the Seventh Amendment's impact on polyfurcation.  The Court nonetheless concludes it can make three statements confidently on the issue.  First, Seventh Amendment concerns are sidestepped entirely when the same jury is used for both phases of the trial.  See In re Rhone–Poulenc Rorer, Inc., 51 F.3d at 1303 ("The problem is not inherent in bifurcation. It does not arise when the same jury is to try the successive phases of the litigation."); Manual for Complex Litigation § 11.632, at 122 ("Generally, when issues are severed for separate trials, they should be tried before the same jury unless they are entirely unrelated.").  Second, the Court must be cautious that no subsequent jury disturbs any issue that a prior jury definitively decided -- and the Court will use the test from the collateral-estoppel analysis to determine whether a prior jury definitively established an issue.[23]  This requirement does not imply a need to "carve at the joint" -- whatever that means[24] -- but merely to do as the Seventh Amendment says, and prevent "reexamination."  Third, and the Court differs with Judge Posner here, most minor reexamination

_____

[23]The Seventh Amendment defines collateral estoppel's contours. See, e.g., SEC v. Monarch Funding Corp., 192 F.3d 295, 304 (2d Cir.1999)(cited by Lab. Corp. of Am. Holdings v. Metabolite Labs., Inc., 410 Fed.Appx. 151, 159 (10th Cir. 2011) (unpublished)).

[24]The Tenth Circuit has never used this term.  It seems to imply that every case only has certain points at which it can be bifurcated, e.g., if a claim contains elements A through E, but the "joint" is between C and D, then the case cannot be bifurcated into a trial on A and B and a separate trial on C through E.  Maybe the Court is reading too much into the metaphor.  In the Court's view, however, separate trials for A and B and C through E would be acceptable, so long as the C-through-E jury respects the prior jury's findings on A and B.

issues -- i.e., issues submitted to different juries that overlap somewhat -- can be resolved by instructing the subsequent jury to adhere to the prior jury's findings and by carefully crafting the verdict form to reflect the prior jury's findings. See In re Paoli R.R. Yard PCB Litig., 113 F.3d 444, 452 n.5 (3d Cir. 1997); EEOC v. Foster Wheeler Constructors, Inc., No. 98-C-1601, 1999 WL 528200, at *3 (N.D. Ill.  July 13, 1999)(Coar, J.)("[A] well-constructed bifurcation scheme, used in tandem with clear instructions to the juries can delineate the roles of the two juries in order to avoid reexamination of any factual issues. . . ."); Steven S. Gensler, Bifurcation Unbound, 75 Wash. L.Rev. 705, 735–37 (2000).

## ANALYSIS

1.      The Court will deny the Motion.  To be certified properly under rule 23(b)(3), a class must meet all four of rule 23(a)'s requirements -- numerosity, commonality, typicality, and adequacy -- and both of rule 23(b)(3)'s requirements -- predominance and superiority. Additionally, the class must be identifiable.  First, while the Plaintiffs' claims satisfy rule 23(a)'s numerosity requirement, they fail to satisfy rule 23(a)'s commonality, typicality, and adequacy requirements.  Second, while the Plaintiffs gender discrimination claims satisfy rule 23(b)(3)'s superiority requirement, they do not satisfy rule 23(b)(3)'s predominance requirement.

## I.      THE PLAINTIFFS' GENDER DISCRIMINATION CLAIMS SATISFY RULE 23(a)(1)'S NUMEROSITY REQUIREMENT.

2.      The Plaintiffs' assert that their class contains 230 members and that the class size satisfies rule 23(a)'s numerosity requirement.  Rule 23(a)(1) requires that the class membership be sufficiently large to warrant a class action, because the alternative of joinder is impracticable. "The Tenth Circuit has stated that there is 'no set formula' to determine whether the numerosity requirement is met; instead, it is a fact-specific inquiry best left to the district court's discretion." Gonzales v. City of Albuquerque, No. CIV 09-0520 JB/RLP, 2010 WL 4053947, at *7 (D. N.M.

Aug. 21, 2010)(Browning, J.)(quoting Rex v. Owens, 585 F.2d 432, 436 (10th Cir. 1978)).  Cf. Mullen v. Treasure Chest Casino, LLC, 186 F.3d 620, 624 (5th Cir.  1999)(finding that the proposed class consisting of "100 to 150 members . . . is within the range that generally satisfies the numerosity requirement").  In determining whether a proposed class meets the numerosity requirement, "the exact number of potential members need not be shown," and a court "may make 'common sense assumptions' to support a finding that joinder would be impracticable." Neiberger v. Hawkins, 208 F.R.D. 301, 313 (D. Colo. 2002)(Babcock, J.)(citation omitted).  See Bittinger v. Tecumseh Prods. Co., 123 F.3d 877, 884 n.1 (6th Cir. 1997)(noting that rule 23(a)(1) is not a "strict numerical test"; holding, however, that where a class comprises over 1,100 persons, suggestion that joinder is not impractical is "frivolous")(citation omitted); Robidoux v. Celani, 987 F.2d 931, 936 (2nd Cir. 1993)("[T]he difficulty in joining as few as forty putative class members should raise a presumption that joinder is impracticable."(citation omitted)).

3.     The Court previously has found that joinder of "several hundred tenants and homeowners" would be impracticable and thus, that the proposed class met rule 23(a)(1)'s numerosity requirement.  See Lowery v. City of Albuquerque, 273 F.R.D. at 683.  Here, the class will comprise of 230 plaintiffs, which far exceeds a class of forty members, and is similar in size with the putative class in Lowery v. City of Albuquerque.  As the Court previously concluded that the joinder of "several hundred tenants and homeowners" would be impracticable, and thus satisfied rule 23(a)(1)'s numerosity requirement, see Lowery v. City of Albuquerque, 273 F.R.D. at 683, the Court concludes that, here, the joinder of up to 230 Bernalillo County female employees and job applicants would be impracticable as well.

4.     "Satisfaction of the numerosity requirement does not require that joinder is impossible, but only that plaintiff will suffer a strong litigational hardship or inconvenience if

joinder is required." Cook v. Rockwell Int'l Corp., 151 F.R.D. 378, 384 (D. Colo. 1993)(Kane, J.).  See Robidoux, 987 F.2d at 935 ("Impracticable does not mean impossible.").  Here the size of the class -- 230 members -- would not necessarily be impossible, but rather impracticable for the Plaintiffs to use joinders for all 230 class members.  The Court concludes that the Plaintiffs have satisfied rule 23(a)(1)'s numerosity requirement.

## II.    THE PLAINTIFFS' GENDER DISCRIMINATION CLAIMS DO NOT SATISFY RULE 23(a)(2)'S COMMONALITY REQUIREMENT.

5.    To satisfy rule 23(a)(2), the Plaintiffs must show that there is a question of law or fact common to the class. Fed. R. Civ. P. 23(a)(2).  A single common question will suffice to satisfy rule 23(a)(2), but the question must be one "that is central to the validity of each one of the claims."  Wal-Mart v. Dukes, 564 U.S. at 350-51.  Here, the Plaintiffs assert that Bernalillo County's centralized policies and procedures leads to discrimination against female employees and job applicants for compensation and hiring decisions, see Martell Report at 20, even though these employment decisions were within individual department managers' discretion, see Torres Depo., 224:7-23.  Because the Plaintiffs' claims are based on individual managers' discretion, some of whom are the representative Plaintiffs in this case, the Court concludes that the Plaintiffs do not satisfy rule 23(a)(2)'s commonality requirement.

6.    To satisfy rule 23(a)(2)'s commonality requirement, the Plaintiffs must show: (i) that the common question is central to the validity of each claim that the proposed class brings; and (ii) that the common question is capable of a common answer.  See Wal-Mart v. Dukes, 564 U.S. at 350-51.  Here, the Plaintiffs fail to satisfy either requirement under Wal-Mart v. Dukes. Bernalillo County's Rules & Regs establish consistent basic policies and practices governing relations between the County of Bernalillo and its employees.   See Rules & Regs at 2. Furthermore, the employment practices and policies apply to all class members and their male

comparators.  <u>See</u> Rules & Regs at 2.  The Plaintiffs assert that these common policies and procedures allow gender discrimination to occur against Bernalillo County's female employees and job applicants.  <u>See</u> Tr. at 16:13-18:17 (Warner).

7.     Individual Bernalillo County managers make employee selection and compensation decisions, which are akin to the employee selection and compensation decisions at issue in <u>Wal-Mart v. Dukes</u>.  Bernalillo County disavows a policy of hiring the most qualified person for the job.  Instead of objective qualifications, the top criterion used in making selective decisions is the "personal preference of the interviewer," a factor that readily lends itself to bias.  Martell Report at 42; Torres Depo., 224:7-23.  Section 304 of the County's Rules & Regs provides that "[t]he basis for a final offer of employment shall include but not be limited to the applicant's qualifications, skills, education, previous applicable experience, personal interview(s), and reference check."  The Bernalillo County-wide policy is that, as long as the candidate meets the minimum qualifications, any choice by a manager for the position is acceptable.  <u>See</u> Martell Report at 42.

8.     In <u>Wal-Mart v. Dukes</u>, a proposed class of about 1.5 million current and former Wal-Mart employees sought damages under Title VII for Wal-Mart's alleged gender-based discrimination.  <u>See</u> 564 U.S. at 347.  Wal-Mart, however, had no centralized company-wide hiring or promotion policy, instead opting to leave personnel matters to the individual store managers' discretion.  <u>See</u> 564 U.S. at 347-48.  The plaintiffs argued that, although no discriminatory formal policy applied to all proposed class members, "a strong and uniform 'corporate culture' permits bias against women to infect, perhaps subconsciously, the discretionary decision making of each one of Wal-Mart's thousands of managers -- thereby making every [proposed class member] the victim of one common discriminatory practice."  564

U.S. at 348.  The Supreme Court disagreed that such a theory constitutes a common question under rule 23(a)(2).  Wal-Mart v. Dukes, 564 U.S. at 348.

9.      Like in Wal-Mart v. Dukes, Bernalillo County's practice is for individual managers to make employee selection and compensation decisions.  See Martell Report at 42; Torres Depo., 224:7-23.   While Bernalillo County's policies are vulnerable to individual managers' gender bias, see Martell Report at 31, 38, and 42, they fail to establish that the proposed class members are "victim[s] of one common discriminatory practice," Wal-Mart v. Dukes, 564 U.S. at 348.   The Plaintiffs' anecdotal evidence, while suggesting individual instances of gender discrimination, see Motion at 35, do not establish that the proposed class members are "victim[s] of one common discriminatory practice," Wal-Mart v. Dukes, 564 U.S. at 348.

10.      The Plaintiffs argue that this case is different from the Wal-Mart v. Dukes, because Wal-Mart did not have discriminatory employment policy affecting female employees, see Tr. at 57:21-25 (Warner), whereas Bernalillo County's employment policies cover the entire organization and therefore that the policies, not the individual decision made by managers following the policies, cause gender discrimination, see Tr. at 59:1-13 (Warner).    An examination of Bernalillo County's Rules and Regs does not suggest that the policy itself creates a common question that a class action could address or resolve.  First, a supervisor, manager, or department director may request a change in compensation for a new hire or current employee within his or her department for the following reasons: (i) in connection with a hire, to offer pay above Step 2 of grade the posted position; (ii) completion of a career ladder goal; (iii) promotion or change in position; (iv) additional duties to existing position (reclassification); (v) temporary supervisory duties; (vi) transfer; or (vii) demotion.  See Motion at 17.  Bernalillo County's

policies therefore leave it to the discretion of individual managers to request pay increases for their subordinate employees.  <u>See</u> Motion at 17.

11.     Second, Bernalillo County's employee selection policy does not demonstrate that it is discriminatory toward female employees or job applicants in a way that presents a common question of law or fact warranting class certification.  The Bernalillo County-wide policy is that, as long as the candidate meets the minimum qualifications, any choice by a manager for the position is acceptable.  <u>See</u> Martell Report at 42.  There is no oversight in place in Bernalillo County to ensure the most qualified job applicants are selected to interview.  <u>See</u> Zdunek Depo. 51:11-18, 52:1-12.  There is no oversight to ensure that hiring managers' selection decisions are correct.  <u>See</u> Chavez Depo. 57:18-58:1, 85:22-86:6.  These facts do not suggest that there is some common policy that would make class resolution of Plaintiffs' claims against Bernalillo County appropriate.

12.     The Plaintiffs assert that, because Bernalillo County disavows a policy of hiring the most qualified person for the job, and that instead of objective qualifications, the top criterion used in making selective decisions is the "personal preference of the interviewer," Bernalillo County's employee selection policies readily lends itself to bias.  Martell Report at 42; Torres Depo. at 224:7-23.  This policy -- which allows managers to select any qualified applicant -- is not, on its face, discriminatory toward female employees or job applicants in a way that presents a common question or resolution that could best be addressed.

13.     Because Bernalillo County's employment policies allow individual managers to use discretion in making employee selection and compensation decisions, the Court analyzes whether those discretionary decisions present a common question or issue that a class action can address.  The Plaintiffs' assertions that as a class, at the hands of numerous supervisors, some of

whom are Plaintiffs as well in this case, they suffered gender discrimination is insufficient to show a common question that a class action can resolve.  Here, the Plaintiffs allege that many different managers perpetrated gender discrimination.  The Supreme Court rejected a similar assertion in Wal-Mart v. Dukes, and held that the plaintiffs' claims that numerous managers committed gender discrimination "must depend upon a common contention -- for example, the assertion of discriminatory bias on the part of the same supervisor.  That common contention, moreover, must be of such a nature that it is capable of classwide resolution."  Wal-Mart v. Dukes, 564 U.S. at 350-51 (quoting Nagareda, supra, at 132).  Here, like in Wal-Mart v. Dukes, numerous managers' employee selection and compensation decisions are at issue, and therefore not "of such a nature that is capable of classwide resolution."  Wal-Mart v. Dukes, 564 U.S. at 350-51 (quoting Nagareda, supra, at 132).

14.     It is hard to spot the common questions in this case.  There are common facts, but not common "questions."  There does not appear to be any dispute about how Bernalillo County decides to hire and pay employees.  The real issues -- whether these individual managers discriminated against women when they hired and paid them -- is contested.  So there is not a common "question"; all the real questions are contextual and specific to the individual decision to hire and pay individual employees.  The Court cannot see a question of fact or law, with one fall swoop, the answer would decide this case.

## III.   THE PLAINTIFFS' GENDER DISCRIMINATION CLAIMS DO NOT SATISFY RULE 23(a)(3)'S TYPICALITY REQUIREMENT.

15.     The Plaintiffs' gender discrimination claims do not satisfy rule 23(a)(3)'s typicality requirement.  Rule 23(a)(3) requires that the named representative's claims be typical of the class' claims.  See Fed. R. Civ. P. 23(a)(3).  The typicality requirement ensures that absent proposed class members are adequately represented by evaluating whether the named plaintiff's

interests are sufficiently aligned with the class' interest.  See Baby Neal ex rel. Kanter v. Casey, 43 F.3d 48, 57 (3d Cir. 1994); Nicodemus v. Union Pac. Corp., 204 F.R.D. 479, 490 (D. Wyo. 2001)(Johnson, J.).   The Supreme Court has noted that "[t]he commonality and typicality requirements of Rule 23(a) tend to merge."  Falcon, 457 U.S. at 157 n.13.  "Provided the claims of Named Plaintiffs and putative class members are based on the same legal or remedial theory, differing fact situations of the putative class members do not defeat typicality."  DG v. Devaughn, 594 F.3d 1188, 1198 (10th Cir. 2010)(citing Adamson v. Bowen, 855 F.2d 668, 676 (10th Cir. 1988)).

16.     "[L]ike commonality, typicality exists where . . . all putative class members are at risk of being subjected to the same harmful practices, regardless of any class member's individual circumstances."  DG v. Devaughn, 594 F.3d at 1199. Factual differences among some of the proposed class members will "not defeat typicality under Rule 23(a)(3) so long as the claims of the class representative and putative class members are based on the same legal or remedial theory."  Adamson v. Bowen, 855 F.2d 668, 676 (10th Cir. 1988).  See Penn v. San Juan Hosp., Inc., 528 F.2d 1181, 1189 (10th Cir. 1975)("It is to be recognized that there may be varying fact situations among individual members of the class and this is all right so long as the claims of Plaintiffs and the other putative class members are based on the same legal or remedial theory.").

17.     Here, the Plaintiffs' allegations of gender discrimination are within the individual managers' discretion.   While Bernalillo County's Rules & Regs establish consistent basic policies and practices governing relations between the County of Bernalillo and its employees, see Rules & Regs at 2, the Bernalillo County-wide employee selection policy is that, as long as the candidate meets the minimum qualifications, any choice by a manager for the position is

acceptable, see Martell Report at 42.  With respect to employee compensation decisions, although the County Manager's approval is required for pay-increase exceptions, a department manager typically initiates the request, which the County Manager ratifies.  See Torres Dec. ¶ 30, at 13.  Moreover, a supervisor, manager, or department director may request a change in compensation for a new hire or current employee within his or her department for the following reasons: (i) in connection with a hire, to offer pay above Step 2 of grade the posted position; (ii) completion of a career ladder goal; (iii) promotion or change in position; (iv) additional duties to existing position (reclassification); (v) temporary supervisory duties; (vi) transfer; or (vii) demotion.  See Motion at 17.  Bernalillo County's employee selection and compensation decisions are therefore within the individual managers' discretion.

18.     "The United States Court of Appeals for the Tenth Circuit has said that the typicality requirement is satisfied if there are common questions of law or fact."  Gianzero v. Wal-Mart Stores, Inc., No. CIV 09-00656 REB/BNB, 2010 WL 1258071, at *3 (D. Colo. Mar. 29, 2010)(Boland, J.)(citing Milonas v. Williams, 691 F.2d 931, 938 (10th Cir. 1982))("In determining whether the typicality and commonality requirements have been fulfilled, either common questions of law or fact presented by the class will be deemed sufficient."); Adamson v. Bowen, 855 F.2d at 676 ("[D]iffering fact situations of putative class members do not defeat typicality under Rule 23(a)(3) so long as the claims of the class representative and putative class members are based on the same legal or remedial theory." (citations omitted)).  Here, the employee selection and compensation decisions are within the discretion of individual managers. These individual decisions implicate different facts and questions of law as each one of these decisions was based on an individual manager and involved an individual employee with individual circumstances, not a common Bernalillo County policy or procedure.  Since each of

the representative Plaintiffs' and proposed class members' allegations of gender discrimination turn on individual actions of a supervisor within his or her discretion as what is permitted within Bernalillo County's Rules & Regs, the representative Plaintiffs do not demonstrate that their claims raise common questions of law or fact or that they are typical of the proposed class.

## IV.   THE PLAINTIFFS' GENDER DISCRIMINATION CLAIMS DO NOT SATISFY RULE 23(a)(4)'S ADEQUACY REQUIREMENT.

19.   The Plaintiffs' gender discrimination claims do not satisfy rule 23(a)(4)'s adequacy requirement.   Rule 23(a)(4) requires that "representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  This requirement protects the due-process interests of unnamed proposed class members -- whom any judgment binds.  See Matsushita Elec. Indus. Co. v. Epstein, 516 U.S. 367, 379 n.5 (1996)(characterizing adequacy of representation as a constitutional requirement); Lile v. Simmons, 143 F. Supp. 2d 1267, 1277 (D. Kan. 2001)(Vratil, J.)("Due process requires that the Court 'stringently' apply the competent representation requirement because putative class members are bound by the judgment (unless they opt out), even though they may not actually be aware of the proceedings.").   "The requirement of fair and adequate representation is perhaps the most important of the criteria for class certification set forth in Rule 23(a)."  Miller ex rel. S.M. v. Bd. of Educ., 455 F. Supp. 2d 1286, 1294 (D.N.M. 2006)(Armijo, J.).  See Cobb v. Avon Prods., Inc., 71 F.R.D. 652, 654 (W.D. Pa. 1976)("Adequacy of the representative is of monumental importance since representation demands undiluted loyalty to the class interests. . . .").

20.   The Tenth Circuit has identified two questions relevant to the adequacy of representation inquiry: (i) whether the named plaintiffs and their counsel have any conflicts with other proposed class members; and (ii) whether the named plaintiffs and their counsel will

vigorously prosecute the action on the class' behalf.  See Rutter & Wilbanks Corp. v. Shell Oil

Co., 314 F.3d 1180, 1187-88 (10th Cir. 2002).  With respect to the first question posed by Rutter

& Wilbanks Corp. v. Shell Oil Co., the Defendants point out that that representative Plaintiffs

Zuniga, Gallegos and Miglio are supervisors with employee selection and compensation

discretion.  The Defendants assert that because some of the representative Plaintiffs are vested

with the ability to make employee selection and compensation decisions that other managers

have used to perpetrate gender discrimination against the Plaintiffs, and that their positions create

a conflict between the class and the representative Plaintiffs, this renders the representative class

inadequate to represent the class.  See Tr. at 111:8-112:18.

      21.    The Plaintiffs argue that Bernalillo County's policies cause discrimination,

although Bernalillo County's employee selection and compensation policies allow for managers

to use their discretion in making those decisions.  Thus, the Plaintiffs' claims involve the

decisions made my individual members by supervisors.  The conflict between members of the

proposed class and representative plaintiffs who serve as supervisors in this case is akin to other

cases where courts have found a conflict existed between the representative plaintiffs and the

proposed class.  Here, female employees and job applicants allege that Bernalillo County

supervisors, in following Bernalillo County policies and procedures, harmed the Plaintiffs.  This

renders the supervisors' conduct, which the Plaintiffs allege follows Bernalillo County policies

and procedures, directly at odds with the Plaintiff class.  Allowing supervisors to serve as

representative Plaintiffs is inadequate and akin to other cases where courts have rejected the

adequacy of representative plaintiffs whose interests were in conflict with their proposed classes.

See Pickett v. Iowa Beef Processors, 209 F.3d at 1280 (finding that representation was

inadequate where the class included those "who claim harm from the very acts from which other

putative class members benefitted"); Broussard v. Meineke Discount Muffler Shops, Inc., 155 F.3d at 344 (holding that the current franchisees who had an interest in the continued viability of the franchiser had an inherent conflict with former franchisees whose only interest was in the maximization of damages); Alston v. Va. High Sch. League, Inc., 184 F.R.D. at 579 (ruling that a class of all high school female athletes could not be certified -- even if the alleged conduct of the defendant school system was discriminatory -- when some female athletes did not share the same goals or interests as the named female plaintiffs, because those unnamed female athletes were satisfied with and/or benefitted from the alleged discriminatory treatment).  The Court concludes that the Bernalillo supervisors are inadequate representative plaintiffs for the proposed class.

22.     In considering the second question posed by Rutter & Wilbanks Corp. v. Shell Oil Co., whether the named plaintiffs in this case will vigorously prosecute the action on the class' behalf, the experience and competence of the attorney representing the class may inform the court's analysis.  See Lopez, 206 F.R.D. at 289-90.  Here, the Plaintiffs' attorneys' competence and experience is not contested, see Tr. at 110:23-111:7 (Frank), and the Court has no doubt that the Plaintiffs' attorneys will vigorously prosecute the action on the class' behalf.  Nevertheless the Court concludes that the Plaintiffs' gender discrimination claims do not satisfy rule 23(a)(4)'s adequacy requirement.

## V.     THE PLAINTIFFS' GENDER DISCRIMINATION CLAIMS DO NOT SATISFY RULE 23(b)(3)'S PREDOMINANCE REQUIREMENT.

23.     The Plaintiffs' gender discrimination claims do not satisfy rule 23(b)(3)'s predominance requirement.  Rule 23(b)(3)'s first requirement is that questions common to the class predominate over those that are individual questions.  See Fed. R. Civ. P. 23(b)(3).  A question is common when "the same evidence will suffice for each member to make a prima

facie showing," <u>Blades v. Monsanto Co.</u>, 400 F.3d 562, 566 (8th Cir. 2005)(citing <u>In re Visa Check/MasterMoney Antitrust Litig.</u>, 280 F.3d 124, 136-40 (2d Cir. 2001)), or when the issue is "susceptible to generalized, class-wide proof," <u>In re Nassau Cnty. Strip Search Cases</u>, 461 F.3d 219, 227 (2nd Cir. 2006).  A question is individual when "the members of a proposed class will need to present evidence that varies from member to member."  <u>Blades v. Monsanto Co.</u>, 400 F.3d at 566.  Here, the Plaintiffs allege that Bernalillo County's employee selection and compensation policies create gender discrimination; however, Bernalillo County's policies leave these decisions to the manager's discretion.  <u>See</u> Martell Report at 42.  Because each of these decisions are within a manager's discretion, each alleged instance of gender discrimination raises individual questions.

24.    Although a case need not present only common questions to merit certification, and the presence of some individual questions does not destroy predominance, the rule 23(b)(3) predominance requirement is much stricter than the rule 23(a)(1) commonality requirement: rule 23(a)(1) requires only that a common question or questions exist -- as rule 23(b)(3) requires that the common question or questions predominate over the individual ones.  <u>See</u> <u>Amchem Prods., Inc. v. Windsor</u>, 521 U.S. 591, 623-24 (1997); <u>In re Thornburg Mortg., Inc. Sec. Litig.</u>, 912 F. Supp. 2d at 1225 ("The predominance criterion of rule 23(b)(3) is 'far more demanding' than rule 23(a)(2)'s commonality requirement.").  Here, while Bernalillo County's county-wide policies apply to all Bernalillo County employees, <u>see</u> Employment Relations Rules & Regs, the gender discrimination alleged by the Plaintiffs involves decisions numerous managers made, <u>see</u> Martell Report at 42; Torres Depo., 224:7-23.  Individual Bernalillo County managers have discretion to make employee selection and compensation decisions; their actions and the alleged discrimination raise individual questions of law and fact.  <u>See</u> Martell Report at 42.  The

Plaintiffs' gender discrimination claims involve decisions made by numerous different managers and involve different circumstances for each individual employees.  Each individual decision that resulted in alleged discrimination therefore involves individual questions of law or fact and fail to demonstrate the predominance of common questions of law or fact.

25.     The Plaintiffs' failure to satisfy rule 23(a)(2)'s commonality requirement also implicates predominance.  The Tenth Circuit, addressing a claim under Title VII of the Civil Rights Act of 1964, stated:

> The myriad discriminatory acts that Plaintiffs allege (<u>e.g.</u>, failure to promote, failure to train, unequal pay, disrespectful treatment, etc.) each require independent legal analysis, and similarly challenge the predominance requirement of Rule 23(b)(3) if not also the commonality requirement of Rule 23(a).
>
> Although we do not rest our decision upon Rule 23(a), cases that interpret that commonality requirement of Rule 23(a) illustrate the instant Plaintiffs' inability to satisfy Rule 23(b)(3)'s 'far more demanding' requirement that common issues predominate.

<u>Monreal v. Potter</u>, 367 F.3d 1224, 1237 (10th Cir. 2004) (Ebel, J.)(footnote omitted).  Here, the Plaintiffs have failed to satisfy rule 23(a)(2)'s commonality requirement in addition to rule 23(b)'s predominance requirement.

26.     As the Court notes when it discussed common questions, the Court has a difficult time seeing a common "question" of law or fact.  There are common facts -- how employees were hired or compensated.  There are in contrast, a lot of individual questions -- what led to all of these individual decisions.  The case appears to be nothing but individual questions.  Accordingly, the individual questions -- the issues that the Court will have to decide -- predominate substantively over any common questions.

**VI.     THE PLAINTIFFS' GENDER DISCRIMINATION CLAIMS SATISFY RULE 23(b)(3)'S SUPERIORITY REQUIREMENT.**

27.     The Plaintiffs' gender discrimination claims satisfy rule 23(b)(3)'s superiority

requirement.  The second requirement for certifying a(b)(3) class is superiority, which means that a class action would be superior to -- not merely just as good as or more convenient than -- all other available procedural mechanisms, including: (i) individual actions by class members; (ii) ordinary joinder rules, see Fed. R. Civ. P. 18–20; (iii) multidistrict litigation, see 28 U.S.C. § 1407; (iv) multiparty multiforum litigation, see 28 U.S.C. § 1369; and (v) the use of bellwether cases.  Plaintiffs can demonstrate superiority of a class action in two ways: (i) the suit can consist of so-called negative value claims -- claims in which the cost of litigation exceeds the likely recovery, rendering them economically non-viable without aggregation; or (ii) the class may consist of such a large volume of similar cases that the judiciary would be overwhelmed if it had to treat each separately.

28.     In addressing whether a proposed class action is superior to other available methods of adjudicating the controversy, courts start with the four factors that rule 23(b)(3)(A)-(D) enumerates, although those factors are not exhaustive.  See Fed. R. Civ. P. 23 advisory committee's notes ("Factors (A)-(D) are listed, non-exhaustively, as pertinent to the findings."); Amchem Prods., Inc., 521 U.S. at 615–16 ("Rule 23(b)(3) includes a nonexhaustive list of factors pertinent to a court's 'close look' at the predominance and superiority criteria.").

29.     The first factor, "the class members' interests in individually controlling the prosecution . . . of separate actions," closely tracks the money value of the individual cases. Fed. R. Civ. P. 23(b)(3)(A).  When individual actions are practical, they are preferred; the United States has a "deep-rooted historic tradition that everyone should have his own day in court," and adjudicating individual disputes is the core activity of the nation's judicial scheme.  Martin v. Wilks, 490 U.S. 755, 762 (1989)(quoting 18C Charles Alan Wright, Arthur R. Miller, Edward H. Cooper, Vikram David Amar, Richard D. Freer, Helen Hershkoff, Joan E. Steinman, Catherine

T. Struve, <u>Federal Practice Procedure, Jurisdiction & Related Matters</u> § 4449, at 417 (1981)).
Women employed at Bernalillo County made $2,895 less per year than men, taking into account
grade and experience.  <u>See</u> Motion at 29-30.  The pay difference between male and female
Bernalillo County employees suggests that the costs to litigate their individual claims before this
Court outweighs the amount of damages each individual Plaintiff could claim and weighs in
favor of the class being a superior method of adjudicating the dispute.

      30.     The second enumerated (b)(3) factor, "the extent and nature of any litigation
concerning the controversy already begun by . . . class members," is closely linked to the first
factor.  Fed. R. Civ. P. 23(b)(3)(B).  The advisory notes to the rules state that "[t]he court is to
consider the interests of individual members of the class in controlling their own litigations and
carrying them on as they see fit.  In this connection the court should inform itself of any
litigation actually pending by or against the individuals."   Fed. R. Civ. P. 23 advisory
committee's notes (citations omitted).  This passage suggests that the extent to which proposed
class members -- or individuals who would otherwise be proposed class members but for being
specifically excluded from the definition by virtue of their individual claims -- have already filed
individual claims is probative evidence of the extent to which they will continue to file
individual claims in the event of certification denial, and indicates a higher "interest[] in
individually controlling the prosecution."  Fed. R. Civ. P. 23(b)(3)(A).   Here, there is no
evidence to suggest that any of the proposed class members or representative Plaintiffs have filed
their own individual cases involving the alleged gender discrimination.   The absence of
individual pending litigation suggests that the proposed class action would be superior to
individual claims.

      31.     The third rule 23(b)(3) factor is "the desirability or undesirability of concentrating

the litigation of the claims in the particular forum," which can be split into two prongs: (i) whether aggregation is desirable; and (ii) whether the particular court at issue is a desirable forum to adjudicate the aggregated dispute.   Fed. R. Civ. P. 23(b)(3)(C).   The first prong, whether aggregation is desirable, is considered by courts as a recitation of the general superiority inquiry; all of the aforementioned factors and considerations apply, and courts should, additionally, consider the interest of judicial economy -- from this perspective, the more cases that can be aggregated, the better.   See Newberg § 4:71.   Here, the Plaintiffs move to aggregate 230 individual proposed plaintiffs and suggest that aggregating hundreds of individual claims would be in the interest of judicial economy and efficiency.   The second prong is whether the particular court at issue is a desirable forum for the litigation.   Some issues that reliably influence the determination of this prong include: (i) the geographic convenience of the parties, witnesses, or class counsel, see Zinser v. Accufix Research Inst., Inc., 253 F.3d 1180, 1191-92 (9th Cir. 2001); (ii) the locus of the harm, as well as any other events forming the basis of the action, see Winkler v. DTE, Inc., 205 F.R.D. 235, 245 (D. Ariz. 2001); (iii) the location of the bulk of the proposed class, see Macarz v. Transworld Sys., Inc., 193 F.R.D. 46, 57 (D. Conn. 2000); and (iv) whether the defendant is located in the forum state, see In re Warfarin Sodium Antitrust Litig., 391 F.3d 516, 534 (3rd Cir. 2004).   "The particular court at issue" does not refer only to the desirability of the United States District Court for the District of New Mexico, or even of the Albuquerque division, but, rather, the prong's inquiry extends all the way down to the level of the individual district judge.   Here, the alleged gender discrimination occurred in Bernalillo County.   The witnesses, parties, and class counsel are all located in close proximity to the Court, suggesting that it would be convenient for the Court to adjudicate the claims.   Moreover, the Court has spent considerable time and resources in reading the briefing, which makes the Court a

desirable forum for the litigation.

32.    The fourth, final, and most important[25] factor a court must consider in assessing superiority is the extent to which the court will be able to manage the class action, if certified, through pre-trial litigation and trial, accurately adjudicating the class' claims -- in particular the individual issues -- and fairly distributing relief among the class members.  See Fed. R. Civ. P. 23(b)(3)(D).  The manageability factor "encompasses the whole range of practical problems that may render the class action format inappropriate for a particular suit."  Eisen v. Carlisle & Jacquelin, 417 U.S. at 164.  The proposed class size, on its own, does not affect manageability; increasing the size of a proposed class only hurts manageability if it introduces new proposed class members with individual issues. See Carnegie v. Household Int'l, Inc., 376 F.3d 656, 660-61 (7th Cir. 2004)(Posner, J.).

33.    This class action does not present insurmountable manageability issues.  In assessing superiority, the Court must consider the extent to which it will be able to manage the class action through pre-trial litigation and trial.  See Fed. R. Civ. P. 23(b)(3)(D).  The manageability factor "encompasses the whole range of practical problems that may render the class action format inappropriate for a particular suit."  Eisen v. Carlisle & Jacquelin, 417 U.S. at 164. This case does not present insurmountable manageability issues.  The evidence of gender discrimination appears strong; the Court has been willing to find, for its factual findings for this class certification decision, that the Plaintiffs have shown by a preponderance of the evidence that there is discrimination.  The focus will be on the managers.  There are only 156 people with discretionary authority for employee selection and compensation decisions.  See Torres Dec. ¶ 5,

---

[25]Newberg writes that the "manageability factor . . . is, by far, the most critical concern in determining whether a class action is a superior means of adjudication.  Indeed, the superiority discussion has, to this point, been playing *Hamlet* without the prince, and now, it is time to usher the prince onstage."  Newberg § 4:72.

at 2.  After they are deposed about people they hired, it is likely that it will be clear that some managers discriminate against women and others do not.   The Plaintiffs will have to ask managers about the reasons for their hires and salary increases, but probably each deponent hired only a few employees.   Some claims may fall by the wayside after the Plaintiffs depose managers and conduct additional discovery.  The Court believes that the task of adjudicating the class action would be manageable.   Nevertheless, while the Court would find a class action would be manageable and superior to handling the Plaintiffs' claim separately, the Court concludes that under the current case law interpreting rule 23(a) and 23(b), the case should not proceed as a class action.

34.     Concluding that the Court cannot soundly certify any of the Plaintiffs' claims under rule 23, the Court reiterates the comments it made in <u>Anderson</u>:

> Having reached the end of this analytical journey, the Court has a few parting concerns regarding its ruling in particular and the state of class-action law in general.   The Court well understands that refusing to certify this class likely closes the courthouse doors to the Plaintiffs' claims forever.  It may be true that each Plaintiff has suffered a cognizable wrong.   Yet, the costs of proving such wrongs are so large and the reward for prevailing so small that the prospect of thousands of individual actions is unfeasible.   <u>Stoneridge Inv. Partners, LLC v. Scientific-Atlanta</u>, 552 U.S. 148, 176-77 (2008)(Stevens, J., dissenting).
>
> That this case is manageable . . . and is likely the only avenue of relief for the Plaintiffs, are all factors that weigh heavily in favor of certifying this class. Supreme Court and Tenth Circuit precedent, however, ties the Court's hands. Those courts have repeatedly instructed that, when faced with class certification, district courts must rigorously enforce rule 23's commonality and predominance requirements -- separate and apart from the more plaintiff-friendly superiority test.  The Court has done its best to faithfully apply that law.  The Court is concerned, however, that appellate courts' increasing hostility towards class actions is a result of their largely unfounded belief that district courts cannot handle them. As the foregoing analysis demonstrates, trying class actions like this one takes some elbow grease and some creativity, but it is not impossible. District courts can, and often do, try cases that are at least as difficult as this one.
>
> At the end of the day, district court judges know whether they can try a case.  If they determine that a class action is manageable and more efficient than other

alternatives, appellate courts should give some deference to their judgment. Under this approach, efficiency, manageability, and superiority would drive the class-certification analysis, rather than commonality and predominance. Such an approach would be a more equitable and pragmatic way to determine class certification than the existing framework. The Court must follow binding precedent.

Anderson, 306 F.R.D. at 461 (internal footnotes omitted).

**IT IS ORDERED** that the requests in the Plaintiffs' Motion and Supporting Memorandum of Law in Support of Motion of Class Certification, filed June 13, 2014 (Doc. 136), to certify a class are denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Whitney Warner
Repps D. Stanford
Moody & Warner, P.C.
Albuquerque, New Mexico

 *Attorneys for the Plaintiffs*

Emily A. Franke
Agnes F. Padilla
Butt Thornton & Baehr P.C.
Albuquerque, New Mexico

 *Attorneys for the Defendants*